**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FLEMING STEEL CO.,                      )
                                        )
    *Plaintiff*,                         )          CIVIL ACTION
                                        )
    v.                                  )          No. 2:16-cv-00727-NBF-LPL
                                        )
JACOBS ENGINEERING GROUP INC.,          )
                                        )
    *Defendant*.                        )
_____ )


**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**BY DEFENDANT JACOBS ENGINEERING GROUP INC.**


Respectfully submitted,

Michael K. Ross
Paul C. Rauser
Serine Consolino
AEGIS LAW GROUP LLP
801 Pennsylvania Avenue, N.W., Suite 740
Washington, D.C. 20004
Tel: (202) 737-3500
mross@aegislawgroup.com

David J. Berardinelli, Pa. ID No. 79204
DEFOREST KOSCELNIK YOKITIS
    & BERARDINELLI
436 Seventh Avenue, 30th Floor
Pittsburgh, PA 15219
Telephone: (412) 227-3100
berardinelli@deforestlaw.com

*Counsel for Jacobs Engineering Group Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

RELEVANT RECORD FACTS .................................................................................... 3

   A.   NAVFAC Marianas Awards Jacobs a Contract to Build a Blast-Rated Hangar at
Andersen Air Force Base. ..................................................................................... 3

   B.   Fleming Decides to Provide Design Assistance to Jacobs. .................................. 4

   C.   NAVFAC Agrees to Sole Source the Hangar Doors to Fleming. ........................ 5

   D.   NAVFAC Requests a Justification & Approval Memorandum. ......................... 6

   E.   Jacobs Begins Design Work on Project 3027. .................................................... 7

   F.   NAVFAC-Pacific Decides Against a Fleming Sole Source. .............................. 7

ARGUMENT ................................................................................................................. 9

   I.    SUMMARY JUDGMENT STANDARD .......................................................... 9

   II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON FLEMING'S BREACH OF
ORAL CONTRACT CLAIM ........................................................................... 10

   A.   There Is No Contemporaneous or Documentary Evidence of an Oral Contract Between
Jacobs and Fleming. ........................................................................................... 11

   B.   Even If There Were an Oral Agreement Between Jacobs and Fleming, Its Terms
Were So Vague as To Be Unenforceable. ......................................................... 12

   C.   The Judicial Estoppel Doctrine Bars Fleming's Breach of Contract Claim. ..... 15

   D.   Neither Cody Hoff Nor Chris Surles Had Authority To Bind Jacobs to the Contract
Alleged. .............................................................................................................. 17

   E.   There Can Be No "Contract" Pertaining to Project 3027 Because Project 3027 Did Not
Exist When the Alleged Contract Was Formed. ............................................... 18

   III.  SUMMARY JUDGMENT SHOULD BE GRANTED ON FLEMING'S NEGLIGENT
MISREPRESENTATION CLAIM .................................................................. 19

   A.   The Economic Loss Doctrine Bars Fleming's Negligent Misrepresentation Claim. ........ 19

   B.   Fleming's Reliance on Jacobs' Alleged Misrepresentations Is Not Justifiable as a Matter
of Law. ............................................................................................................... 20

       1.   Fleming Is a Sophisticated Actor Whose President Was Familiar with the FAR. .... 21

       2.   Mr. Kohn Could Have—But Did Not—Confirm the Status of the J&A. ................ 22

   C.   Fleming's Damages Are Limited To Its Concrete Pecuniary Losses Incurred After
September 12, 2011. ........................................................................................... 23

       1.   Fleming Cannot Recover Expectancy Damages. ....................................... 23

       2.   Fleming Cannot Recover the "Value" of Its Designs. ............................... 24

       3.   Fleming Cannot Recover for Losses Incurred Before the First Alleged
Misrepresentation ...................................................................................... 25

D.   The Court Should Grant Summary Judgment on Fleming's Claim for Punitive Damages. .................................................................................................................. 26

E.   The Court Should Grant Summary Judgment on Fleming's Negligent Misrepresentation Claim Pertaining to Project 3027. .................................................................................. 27

IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON FLEMING'S UNJUST ENRICHMENT CLAIM .................................................................................................. 28

A.   Fleming Has Not Quantified the Value of Its Services .................................................... 29

B.   Establishing the Reasonable Value of Fleming's Services Requires Expert Testimony .. 30

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................ 9, 10

*Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (2005) ............................ 20

*Bobin v. Sammarco*, CIV. A. 94-5115, 1995 WL 303632 (E.D. Pa. May 18, 1995) ................. 25

*Brand Mktg. Group LLC v. Intertek Testing Services*, *N.A., Inc.*, 801 F.3d 347 (3d Cir. 2015) .. 23

*Calgon Carbon Corp. v. ADA-ES, Inc.*, CIV.A. 08-1355, 2010 WL 2985947 (W.D. Pa. July 27, 2010) ........................................................................................................................................... 28

*Castillo v. Coca-Cola Bottling Co. of Eastern Great Lakes*, CIV.A. 06-183, 2006 WL 1410045 (E.D.Pa. May 22, 2006) ........................................................................................................... 16

*Channel Home Centers, Grace Retail v. Grossman,* 795 F.2d 291 (3d Cir. 1986) .................... 12

*Clark Resources, Inc. v. Verizon Business Network Services, Inc.,* 2012 WL 1339697 (M.D.Pa. 2012) .................................................................................................................................... 17, 18

*Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d 544 (W.D.Pa. 2003) .................................. 21

*D & G Equip. Co. v. First Nat'l Bank,* 764 F.2d 950 (3d Cir. 1985) .......................................... 17

*Emery v. Third Nat. Bank of Pittsburgh*, 162 A. 281 (Pa. 1932) ................................................. 21

*Engstrom v. John Nuveen & Co., Inc.*, 668 F. Supp. 953 (E.D.Pa. 1987) ............................. 12, 13

*Excavation Techs., Inc. v. Columbia Gas Co. of Pennsylvania*, 985 A.2d 840 (Pa. 2009) ......... 19

*Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 Fed.Appx. 202, 2003 WL 22596658 (3d Cir. 2003) ......................................................................................................................................... 10

*Glover v. Udren*, CIV. 08-990, 2014 WL 4348078 (W.D.Pa. Sept. 2, 2014) .............................. 28

*Hardee-Guerra v. Shire Pharmaceuticals*, 737 F. Supp. 2d 318 (E.D.Pa. 2010) ........................ 16

*Haymond v. Lundy*, 2000 WL 804432 (E.D. Pa. June 22, 2000) .................................................. 21

*Hedges v. Primavera*, 218 F. Supp. 797 (E.D.Pa. 1963) ............................................................. 24

*Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 582 Pa. 114 (Pa. 2005) ..................... 26, 27

*Inoff v. Craftex Mills, Inc.*, CIV. A. 06-3675, 2007 WL 4355385 (E.D.Pa. Dec. 11, 2007) ........ 29

*Jennings v. Pittsburgh Mercantile Co.*, 202 A.2d 51, 414 Pa. 641 (Pa. 1964) ............................ 18

*Kaufman v. Mellon Nat. Bank & Trust Co.*, 366 F.2d 326 (3d Cir. 1966) ................................... 24

*Killian v. McCulloch*, 850 F. Supp. 1239 (E.D.Pa. 1994) ........................................................... 23

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003) .................................................................................................................................... 15, 16

*Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408 (W.D. Pa. 2009) ................................ 21, 25

*Marsh v. Norfolk S., Inc.*, 243 F. Supp. 3d 557 (M.D. Pa. 2017) ................................................ 26

*Marshall v. Fenstermacher*, 388 F. Supp. 2d 536 (E.D. Pa. 2005) ............................................. 25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................... 10, 12

*McMunn v. Babcock & Wilcox Power Generation Group, Inc.*, 869 F.3d 246 (3d Cir. 2017) .... 30

*Mieczkowski v. Salvation Army*, 3:15CV2146, 2017 WL 282892 (M.D. Pa. Jan. 23, 2017) ....... 26

*Paraxel Int'l Corp. v. Feliciano,* No. 04–CV–3798, 2008 WL 2704569 (E.D.Pa. July 3, 2008) 29

*Partners Coffee Co., LLC v. Oceana Services & Products Co.*, 700 F. Supp. 2d 720 (W.D. Pa. 2010) ..................................................................................................................................... 25

*Peters v. Stroudsburg Trust Co.*, 348 Pa. 451, 35 A.2d 341 (1944) ............................................. 24

*Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002) ................................................................... 20

*Quandry Solutions Inc. v. Verifone Inc.*, 2009 WL 997041 (E.D.Pa. 2009) ........................ 13, 15

*Rossi v. Schlarbaum*, 2009 WL 722297 (E.D.Pa. 2009)............................................................ 29

*Smith v. Lincoln Ben. Life Co.*, 395 Fed.Appx. 821, 2010 WL 3730196 (3d Cir. 2010) ............ 19

*Solarchick ex rel. Solarchick v. Met. Life Ins. Co.*, 430 F. Supp. 2d 511 (W.D.Pa. 2006).......... 24

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008) .............................. 18

*Standefer v. T. S. Dudley Land Co.*, 2010 WL 11534333 (M.D.Pa. 2010) ................................ 20

*Steven T. Flowers v. Shein & Brookman, P.A., Melvin Brookman and Joseph D. Shein*, 9 Phila.Co.Rptr. 145 (Pa. Com. Pl. 1983)................................................................................... 13

*Torres v. Borzelleca*, 641 F. Supp. 542 (E.D.Pa. 1986)............................................................. 24

*Wu v. Arouh*, 2016 WL 9776072 (E.D.Pa. May 3, 2016)............................................................. 26

*Young v. Com. Dept. of Transp.*, 744 A.2d 1276, 560 Pa. 373 (Pa. 2000) ................................. 30

*Zukoski v. Baltimore & O. R. Co.*, 315 F.2d 622 (3d Cir. 1962) ................................................. 13

## INTRODUCTION

Plaintiff Fleming Steel, having failed in its years-long quest to obtain recompense from the U.S. Navy for not designating it the sole-source supplier of certain hangar doors, abruptly reversed course in 2016 and initiated this action against Jacobs, seeking to extract monies from Jacobs when it became clear that the Navy simply would not pay. Fleming premised its lawsuit on the utterly implausible allegation that two sophisticated, experienced defense contractors entered into a multi-million-dollar oral contract in which Jacobs promised to compel the U.S. Navy to sole-source Fleming products in two military procurements. Now that discovery is complete, we know that this supposed oral contact was never made. There is no documentary or other evidence suggesting the existence of an oral contract; indeed, all evidence points to the contrary. For the reasons set forth below, Jacobs respectfully asks the Court to enter judgment in its favor—there is simply no contract between the parties, nor is Fleming entitled to recover on any of its other theories seeking to plead around that inconvenient fact.

In May 2011, Plaintiff Fleming Steel Company ("Fleming"), a sophisticated and experienced subcontractor on federal procurement projects, decided to help Jacobs Government Services Company[1] prepare conceptual designs for the main doors on a U.S. military aircraft hangar to be built in Guam. SOF ¶¶ 18, 112. Fleming provided this help for free because it hoped to obtain an advantage in competing for the multi-million-dollar subcontract to build the doors. SOF ¶¶ 7, 20.

In late July 2011, after Fleming's design work was well underway, Fleming decided to seek the holy grail of defense contracting: for the U.S. Navy to designate Fleming—and no other vendor—as the sole-source supplier of the hangar doors. Fleming asked Jacobs to raise this issue

---

[1] Jacobs Government Services Company is a wholly-owned subsidiary of Defendant Jacobs Engineering Group Inc. For the purposes of this motion, both the corporate parent and the subsidiary will be referred to as "Jacobs."

with the Navy on Fleming's behalf, which Jacobs promptly did. SOF ¶¶ 21-23.  The Navy agreed

that it made sense to sole-source the manufacture of the hangar doors to Fleming, and requested

the required documentation. SOF ¶ 27.

 Among other documents, the Navy requested that Jacobs have Fleming complete

portions of a Justification & Authorization ("J&A") memorandum, which is required for

approving sole-source awards on federal procurement projects. SOF ¶ 41.  Fleming completed

the J&A, and upon receipt from Fleming, Jacobs promptly forwarded the J&A to the Navy's

design manager in charge of the project. SOF ¶¶ 41-43.

Ordinarily, the Navy's design manager would have forwarded the J&A internally for

signature. SOF ¶ 54.  Lack of congressional funding, however, stalled the project. SOF ¶ 53.

Some months later in 2012, the Navy design manager left the Navy for another job.  The J&A

remained unsigned as the project was on hold throughout 2012 and 2013. SOF ¶ 55.  In 2014,

new Navy personnel concluded that sole-sourcing the hangar doors to Fleming was not

appropriate, and refused to approve the J&A. SOF ¶¶ 76-77.  Fleming was denied the sole-

source.

Fleming blamed the Navy, and sought compensation.  In a June 2014 letter to U.S.

Senator Toomey seeking his assistance, Fleming's president and owner described the paperwork

error thusly:

> We recently learned that because of the time elapsed, the Navy's
> engineer had neglected to sign the J&A, thus giving us undisputed
> sole-source status. We have been led to understand that he/she had
> been rushed off to another assignment and thereby this issue fell
> through the cracks.

Concise Statement of Material Facts ("SOF") ¶ 57.  After many months of lobbying by Fleming,

the Navy refused Fleming's request for compensation. SOF ¶ 85.

Having failed to obtain compensation from the Navy, Fleming pivoted and filed this suit against Jacobs.  Despite previously blaming the Navy, Fleming now contends that Jacobs is at fault.  Fleming alleges here, for the first time, that it had an "oral contract" with Jacobs under which Jacobs agreed to "get" the sole-source designation from the Navy and "assumed the risk" if the Navy refused.  Though there is no mention of an oral contract among the thousands of emails between Fleming and Jacobs about the project—and even Fleming's president himself has conceded that he ***"[did not] know if [there was] a contract, per se"***—Fleming presses this claim. SOF ¶ 95.  As detailed below, Fleming's breach of contract claim is a *post-hoc* legal creation unsupported by any contemporaneous evidence.  It fails as a matter of law.

Fleming also asserts negligent misrepresentation and unjust enrichment claims.[2]  But those claims, too, fail as a matter of law under the undisputed material facts.  There is no legal theory that allows recovery from Jacobs for Fleming's disappointment at not receiving the sole-source it hoped for from the Navy.

## RELEVANT RECORD FACTS

Jacobs is an Architectural/Engineering ("A/E") firm with experience in design management for government projects. SOF ¶¶ 1, 3.  In 2009, Jacobs and another company, Burns & McDonnell, formed a joint venture to bid on construction projects, such as aircraft hangars. *See id.*

### A.  NAVFAC-Marianas Awards Jacobs a Contract to Design a Blast-Rated Hangar at Andersen Air Force Base in Guam

In February 2011, the U.S. Naval Facilities Engineering Command ("NAVFAC") — specifically its Marianas Islands branch ("NAVFAC-Marianas")—awarded the joint venture a task order for Project AJJY123010, Guam Fuel Systems Maintenance Hangar (hereafter,

---

[2] Fleming has abandoned its other causes of action against Jacobs.

"Project 3010"). SOF ¶ 2.  The task order was for the design of an aircraft hangar at Andersen

Air Force Base in Guam.  *See id.*  The Project 3010 hangar required, among other components,

blast-hardened hangar doors. SOF ¶ 4.  Those doors were a "performance specification" item: the

doors had to meet certain operational criteria. SOF ¶ 5.

      A/E firms will often consult with relevant manufacturers for design guidance to ensure

that the performance specifications included in a design package fully outline the required

operational criteria. SOF ¶ 6.  Manufacturers are incentivized to provide this guidance because it

gives them insight into what the procurement will eventually require, and therefore a potential

advantage in landing a subcontract with the project's general contractor. SOF ¶ 7.

### B.  Fleming Decides to Provide Design Assistance to Jacobs

      In approximately May 2011, Jacobs asked Fleming whether it would be willing to assist

with developing hangar door concept designs for Project 3010. SOF ¶ 17.  Seth Kohn—

Fleming's president, owner, and main point of contact with Jacobs—replied that Fleming "would

be happy to assist on the blast door concepts." SOF ¶¶ 15, 16, 18.  Over the next several months,

Jacobs and Fleming collaborated to develop high-level hangar door concept designs, including

designs for the hangar door head. SOF ¶ 19.

      At the end of July 2011, after Fleming's design assistance was mostly done, Mr. Kohn

informed Jacobs that Fleming had "reached the end of its financial donation to the project," and

asked Project 3010's project manager, Cody Hoff, to inquire about the possibility of a sole-

source award for Fleming. SOF ¶¶ 20-21.  Mr. Hoff agreed to try, and approached NAVFAC's

project team about sole-sourcing the manufacture of the hangar doors to Fleming. SOF ¶¶ 22-23.

      On July 29, 2011, Chris Surles—a Jacobs architect for Project 3010—informed Mr. Kohn

by email that Jacobs had raised with NAVFAC "the possibility of using Fleming as a sole-source

for the Hangar Doors" and was awaiting NAVFAC's response. SOF ¶¶ 10, 24.  Over the next six weeks, Mr. Kohn repeatedly asked Mr. Surles whether NAVFAC had "made any decisions yet regarding [sole-sourcing] the large blast doors," reminding him that "Fleming would certainly like to be on board." SOF ¶ 25.

### C.  NAVFAC Agrees to Sole-Source the Hangar Doors to Fleming

On September 8 and 9, 2011, Mr. Hoff and other Jacobs employees attended a project review meeting with NAVFAC-Marianas representatives in Guam. SOF ¶ 26.  At the meeting, NAVFAC stated that Fleming would be the sole-source manufacturer of the hangar doors, and requested that Fleming prepare a Rough Order of Magnitude ("ROM") to estimate the cost of the sole-sourced item. SOF ¶¶ 27, 28.  On September 12, 2011, Mr. Surles informed Mr. Kohn by email that "NAVFAC has agreed to the sole sourcing as they understand that the hangar doors are a unique design. They will require a Rough Order of Magnitude from you to review."  Mr. Kohn replied, "[t]hat is good news." SOF ¶ 29.  Mr. Kohn understood, however, that "until paperwork is generated and signed [by the Navy], it's not 100 percent official . . . ." SOF ¶ 116.

On October 3, 2011, Fleming sent Jacobs the requested ROM budget quote, estimating the total costs for fabricating the hangar doors. SOF ¶ 30.  That same day, Mr. Hoff forwarded the ROM budget quote to John DeVenecia and Clarence Lagutang at NAVFAC, who were Jacobs' primary points of contact on Project 3010.  Both reviewed the ROM upon receiving it. SOF ¶¶ 35, 36.

The ROM budget quote reflected the understanding between Jacobs and NAVFAC— which Jacobs conveyed to Fleming—that Fleming would be the sole-source supplier of the hangar doors.  The ROM budget quote was on Fleming letterhead, signed by Seth Kohn, and stated that "we are pleased to offer **our** ROM budget quotation for furnishing . . . [a] set of blast

rated hangar doors." (emphasis added). SOF ¶¶ 32, 33.  The budget quote also identified costs to NAVFAC "should [NAVFAC] require *Fleming* supervision on site," an unmistakable reference to Fleming's expected involvement in the door installation. (emphasis added). SOF ¶ 34.

### D.  NAVFAC Requests a Justification & Approval Memorandum

In December 2011, NAVFAC requested that Jacobs and Fleming prepare a J&A memorandum describing the rationale for the sole-source. SOF ¶ 41.  The Federal Acquisition Regulations ("FAR") require a J&A memorandum signed by NAVFAC for a sole-source designation to be effective. SOF ¶¶ 38, 39.

On December 16, 2011, Mr. Hoff sent Mr. Kohn NAVFAC's request for a J&A from Fleming. SOF ¶ 41.  In that same email, Mr. Hoff informed Mr. Kohn that Project 3010 had been postponed "until at least FY14" because of lack of funding. SOF ¶ 42.

Five weeks later, on January 19, 2012, Mr. Kohn sent draft J&A language to Mr. Hoff. SOF ¶ 43.  Mr. Hoff completed the J&A memorandum, and emailed the unsigned J&A to Mr. DeVenecia, the NAVFAC design manager on Project 3010. SOF ¶ 44.  On January 29, 2012, Mr. DeVenecia instructed Mr. Hoff to include the "hangar door sole-source" to Fleming in Project 3010's "final design submittal." SOF ¶¶ 45, 46 (1/20/11 email from C. Hoff including "Item 87 – [Hangar] Door Sole-source – We will include with our final design submittal"; Mr. DeVenecia replies on 1/29/11, "Concur, please execute.").

Jacobs submitted the Project 3010 design package to NAVFAC on or about January 31, 2012. SOF ¶ 47. The design package included (1) the hangar door specifications, which *specifically identified Fleming as the sole-source supplier of the hangar doors*; and (2) the J&A for signature by NAVFAC. SOF ¶¶ 48, 49.  NAVFAC personnel reviewed the

specifications at that time, but did not instruct Jacobs to remove Fleming's name, or object in any way to Fleming being identified as the sole-source supplier of the hangar doors. SOF ¶ 51.

Ordinarily, Mr. DeVenecia would have forwarded the J&A internally within NAVFAC for signature. SOF ¶ 54. However, a Congressional budget dispute stalled the project, and six months later, Mr. DeVenecia left NAVFAC for a position with the Department of Defense. SOF ¶¶ 53, 55. The J&A remained unsigned. During the multi-year delay of Project 3010, no one at NAVFAC ever informed Jacobs that the J&A had not been signed. SOF ¶ 57.

### E.  Jacobs Begins Design Work on Project 3027

In October 2012, NAVFAC issued Jacobs/Burns & McDonnell a second task order, AJJY133027 ("Project 3027"), to provide A/E services for another Andersen Air Force Base hangar, adjacent to the Project 3010 hangar. SOF ¶ 58. NAVFAC-Pacific, which oversees NAVFAC-Marianas, administered Project 3027. *See id.*

In a January 2013 email, Cody Hoff informed Seth Kohn about Project 3027. The Project 3027 hangar doors were to be identical to the Project 3010 hangar doors, and thus no additional design work was needed or requested from Fleming for Project 3027. SOF ¶ 63. Mr. Hoff made no representations to Mr. Kohn at that time about whether the Navy had agreed to sole-source the Project 3027 hangar doors to Fleming. SOF ¶ 64.

### F.  NAVFAC-Pacific Decides Against a Fleming Sole-Source

In approximately May 2014, NAVFAC-Pacific opened the bidding process for construction of Project 3027 by issuing a request for proposals ("RFP") from general contractors.[3] SOF ¶ 65. The Project 3027 specifications identified Fleming as the sole-source supplier of the hangar doors. SOF ¶ 66.

---

[3] Bidding for Project 3010 opened approximately one month after Project 3027.

Shortly after bidding began, NAVFAC received a Request for Information ("RFI") from a potential general contractor inquiring whether other hangar door manufacturers could be substituted for Fleming. SOF ¶ 67. This question prompted NAVFAC-Pacific's contracting officer—apparently unaware that the bid documents named Fleming as the sole-source supplier of the hangar doors—to inform Jacobs that NAVFAC could not "sole-source the door manufacturer at this point" because "[s]ole source justification approvals are required prior to advertising the project." SOF ¶ 68.

In early June 2014, Mr. Hoff spoke with Mr. Lagutang at NAVFAC-Marianas about the sole-source justification for Project 3010, and learned for the first time that the Project 3010 J&A had never been signed by NAVFAC. SOF ¶¶ 69-70. The following day, the NAVFAC-Pacific team directed Jacobs to remove the sole-source design elements from the Project 3027 specifications. SOF ¶ 71. Mr. Hoff immediately pushed back, emphasizing that "[t]he government direction established during [Project 3010] was to sole-source the doors [to Fleming]." SOF ¶ 72.

Mr. Hoff continued to press NAVFAC for the Fleming sole-source, but to no avail. SOF ¶ 73. On June 20, 2014, one of Fleming's competitors, Industrial Door, sent a letter to NAVFAC protesting Fleming's designation as the sole-source supplier of the hangar doors in the Project 3027 bid documents; Mr. Kohn suspected that Industrial Door was attempting to leverage an inside connection that it had with NAVFAC. SOF ¶¶ 74-75. On July 2, 2014, NAVFAC announced that the identification of Fleming in the RFP materials was an "error" and that Fleming's name would be removed. SOF ¶ 76.

On September 17, 2014, NAVFAC announced to potential bidders that, due to Fleming's participation in the design of the hangar doors, "an apparent Organizational Conflict of Interest

exists that would likely preclude Fleming's participation in this effort as either a prime or subcontractor." SOF ¶ 77.  NAVFAC advised, "[s]hould any [general] contractor wish to submit a proposal utilizing Fleming," it must "address the apparent OCI in [its] proposal, and provide a detailed explanation with supporting documentation." SOF ¶ 78.  None did. SOF ¶ 79. Ultimately, the successful general contractor teamed with Norco Manufacturing as its subcontractor to design and manufacture the hangar doors for both Guam hangar projects. SOF ¶ 80.

After failing to receive a subcontract for the hangar doors, Fleming retained a Washington lobbying firm—O'Brien, Gentry, & Scott (OGS)—to represent it. SOF ¶ 81.  For well over a year, OGS corresponded both with the Navy and with Fleming's congressional representatives requesting, among other things, that the Navy compensate Fleming for its "loss." SOF ¶¶ 85-86.  The Navy denied Fleming's request for financial compensation. *See id.*  In June 2016, Fleming filed this action against Jacobs.

<u>**ARGUMENT**</u>

## I.   SUMMARY JUDGMENT STANDARD

The summary judgment standard is well-settled and familiar to the Court.  Summary judgment should be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e)(2).

Of course, the mere existence of some factual dispute between the parties will not defeat summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986).  The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on

which it bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

## II.     SUMMARY JUDGMENT SHOULD BE GRANTED ON FLEMING'S BREACH OF ORAL CONTRACT CLAIM

Under Pennsylvania law, a cause of action for breach of contract has three elements: "(1)

the existence of a contract, including its essential terms, (2) a breach of duty imposed by the

contract, and (3) resultant damages." *Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 Fed. Appx.

202, 206, 2003 WL 22596658, at *4 (3d Cir. 2003).

Fleming's breach of contract claim fails as a matter of law on the undisputed facts for

four independent reasons. *First*, the record is devoid of any evidence of a purported oral contract

between Fleming and Jacobs. *Second*, even if some oral contract existed, it was too indefinite to

be enforceable. *Third*, the doctrine of judicial estoppel bars Fleming's claim of an oral contract

with Jacobs because it failed to disclose any such contract in its Chapter 11 Disclosure Statement

filed with the U.S. Bankruptcy Court for the Western District of Pennsylvania. *Fourth*, the

Jacobs employees who Fleming claims agreed to the multi-million-dollar oral contract lacked the

actual or apparent authority to do so.

Additionally, Fleming's breach of contract claim necessarily fails as to Project 3027

because that project did not exist at the time the alleged oral contract was formed. As Mr. Kohn

testified in deposition, the alleged promise by Jacobs to "get" Fleming sole-sourced by

NAVFAC concerned only Project 3010. SOF ¶ 95.

**A.  There Is No Contemporaneous or Documentary Evidence of an Oral Contract Between Jacobs and Fleming**

As an initial matter, the notion that Fleming and Jacobs—two sophisticated and highly-experienced companies—would enter into a multi-million-dollar *oral* agreement as to an action that can only be effectuated by a government entity (namely, NAVFAC) strains credulity.  As Fleming's president and owner testified in his deposition, it has been Fleming's customary practice for many years to get its agreements with general contractors in writing. SOF __.

Notably, there is no documentary evidence—none at all—that any oral contract existed between Fleming and Jacobs.  Thousands of emails between were produced during discovery; none mention any contract between Jacobs and Fleming. SOF ¶¶ 91-92.  (S. Kohn Dep."Q: In all of the thousands of pages of documents that have been produced by Jacobs Engineering, Fleming Steel, and various third parties that have been subpoenaed in this case, I haven't seen a single email referencing any oral contract between Fleming Steel and Jacobs Engineering; have you? A: No.").  Nor are there any memoranda memorializing the phone conversation during which Fleming alleges the oral contract was formed, even though Fleming's regular practice is to memorialize important phone calls. SOF ¶¶ 89-90.  And, after NAVFAC denied the sole-source, Fleming never invoiced Jacobs for amounts supposedly due under the alleged oral contract. SOF ¶ 93.

Even Fleming's own executives were unaware of any purported oral contract between Fleming and Jacobs.  Tom Rapp, Fleming's VP of Operations, testified in his deposition that he had no knowledge of Jacobs having "guaranteed" Fleming a sole-source for Project 3010. SOF ¶¶ 101-102.  John Gavroy, Fleming's chief engineer for the hangar door project, testified that there was "no contract" between Fleming and Jacobs, and that he had never discussed any such contract with Mr. Kohn. SOF ¶¶ 96-99.

Nor did Fleming inform any third party that it had a multi-million-dollar oral contract with Jacobs.  Most glaringly, just months after Fleming claims the contract was formed, it filed a Disclosure Statement in a bankruptcy proceeding it initiated in the Western District of Pennsylvania. SOF ¶¶ 105-106.  Fleming's Disclosure Statement, certified for accuracy by Mr. Kohn and by Fleming's counsel in the instant action, required Fleming to list all leases and executory contracts to which Fleming was a party as of that date. SOF ¶¶ 107-108.  Although the Disclosure Statement identifies four construction subcontracts, it lists no contract with Jacobs. SOF ¶¶ 109-110.  Finally, Stephanie Kostro of OGS (the Washington lobbying firm hired by Fleming) testified that Mr. Kohn never mentioned to her the existence of any oral contract between Fleming and Jacobs prior to the filing of this lawsuit. SOF ¶¶ 83-84.

The abject lack of any documentary or contemporaneous evidence of an oral contract between the parties leaves only Mr. Kohn's self-serving deposition testimony to support Fleming's claim.  As detailed in Section I.B below, however, Mr. Kohn's vague and conclusory testimony falls far short of establishing the existence of an oral contract.  In fact, it demonstrates the opposite: that no enforceable contract was formed.  On this record, no "rational trier of fact" could find that an enforceable oral contract existed here.  *Matsushita*, 475 U.S. at 587.

### B. Even If There Were an Oral Agreement Between Jacobs and Fleming, Its Terms Were So Vague As To Be Unenforceable

Even if the oral agreement alleged by Fleming was formed—and there is no contemporaneous evidence that it was—it was too indefinite as to be enforceable.

Under Pennsylvania law, "an agreement is enforceable only if both parties manifest an intent to be bound by its terms, the terms are sufficiently definite to be specifically enforced, and the agreement is supported by consideration."  *Engstrom*, 668 F. Supp at 962 (citing *Channel Home Centers, Grace Retail v. Grossman,* 795 F.2d 291, 298-99 (3d Cir. 1986)).  Stated

differently, "[i]t is a fundamental principle of contract law that in order for a contractual undertaking to be legally enforceable the nature and extent of its obligations must be certain." *Steven T. Flowers v. Shein & Brookman, P.A., Melvin Brookman and Joseph D. Shein*, 9 Phila.Co.Rptr. 145, 148 (Pa. Com. Pl. 1983) (citing *Zukoski v. Baltimore* & *O. R. Co.*, 315 F.2d 622 (3d Cir. 1962)).

When evaluating the enforceability of an oral contract at the summary judgment stage, "the Court must determine whether a reasonable jury, reviewing the undisputed facts presented by the parties, could find that the parties formed an oral contract." *Quandry Solutions Inc. v. Verifone Inc.*, CIV.A.07-097, 2009 WL 997041, at *6 (E.D.Pa. Apr. 13, 2009). Summary judgment is warranted where the alleged contract is indefinite or is missing essential terms. *See, e.g.*, *Steven T. Flowers*, 9 Phila.Co.Rptr. at 159 (granting summary judgment because there was "no mention" of "how much time the plaintiff was expected to devote" to the contract, nor the "amount of compensation" he would receive); *Quandry*, 2009 WL 997041, at *13 (granting summary judgment because the court could not surmise "what specific services were to be provided by [the plaintiff] . . . , or the time and manner of performance"); *Engstrom v. John Nuveen & Co., Inc.*, 668 F. Supp. 953, 962 (E.D. Pa. 1987) (granting summary judgment because "[p]romises of 'excellent treatment' in salaries, bonuses and promotions or to 'make up' for [the plaintiff's] lost stock investments through other payments are not sufficiently definite to be specifically enforced").

As noted, Fleming's sole evidentiary support for its alleged oral contract is Mr. Kohn's deposition testimony. That testimony, however, falls far short of establishing an enforceable contract. As Mr. Kohn himself acknowledges, he "*[does not] know if you can call it a contract, per se.*" SOF ¶ 95 (emphasis added). Mr. Kohn testified in his deposition as follows:

Q: Okay. So the -- is it your testimony that there was a particular call that you had with Jacobs personnel in which a contract was reached?

A: I don't know if you can call it a contract, per se, in the fact that we've had many calls. And when they finally came back said, we'll get you sole-sourced, we need this design, and I agreed to go ahead and finish the design work. And that was the only reason I pursued it, was because I was told, we will get you the sole sourcing.

[ . . . ]

Q: Do you remember the time frame? Was it in September 2011, later or before it?

A: It was after May 24th of 2011, and it probably wasn't much further after that, probably within a couple weeks to a month.

Q: But you don't know exactly when?

A: I don't recall.

Q: And what precise words do you remember the Jacobs personnel, people, using in terms of indicating to you that Fleming would be sole-sourced?

A: To the best of my recollection it was, "We will get you sole-sourced."

Q: And you understood that to mean that Jacobs was telling you that they would get NAVFAC to sole-source Fleming Steel for the projects (sic)?

A: They would get it done, yes.

[ . . . ]

Q: **And tell me everything you remember about that phone call**.

A: **I just did**. **They called, they wanted to know if we were proceeding. I said no, I cannot proceed any further. I've got to have some assurances. We'll get you the sole-source, period. And I said, okay, fine, I'll commit my resources to it.**

*See id.* (emphasis added).

- 14 -

Mr. Kohn's description of the alleged contract is so vague that its most basic terms are left to speculation. What work was Fleming required to perform? More specifically, given that Mr. Kohn could not identify the date on which this key phone call allegedly occurred, how much "design work" remained to be done? Was Jacobs required to pay Fleming anything for its services; if so, how much and how was that amount to be calculated? What was to happen if the Navy, which cannot be forced to grant a sole-source, refused? And what, exactly, constitutes "get[ing]" Fleming the sole-source—after all, Jacobs *did* submit a J&A for Fleming at NAVFAC's request, arguably doing everything within its power to obtain the sole-source.

In sum, the only "evidentiary" support for Fleming's alleged oral contract—under which it seeks millions of dollars—is Mr. Kohn's vague deposition testimony. That testimony is not "sufficiently definite to be enforced" as a contract under Pennsylvania law. *See Quandry*, 2009 WL 997041, at *13.

### C. The Judicial Estoppel Doctrine Bars Fleming's Breach of Contract Claim

The doctrine of judicial estoppel is another, independent reason why Fleming's breach of contract claim fails as a matter of law. Judicial estoppel bars a litigant from asserting a position inconsistent with one it took previously before a court or agency. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003).

On November 14, 2011—five months after Fleming claims that it entered the alleged oral contract with Jacobs—Fleming filed its Disclosure Statement in the bankruptcy proceeding described above. SOF ¶¶ 105-106. That Disclosure Statement required Fleming to list all leases and executory contracts to which Fleming was a party as of that date. SOF ¶ 108. Although the Disclosure Statement identifies four construction subcontracts, it lists no contract with Jacobs.

SOF ¶¶ 109-110.  Mr. Kohn and Fleming's counsel in this litigation each certified the accuracy of Fleming's Disclosure Statement.  SOF ¶ 107.

Courts within the Third Circuit repeatedly have held that judicial estoppel bars plaintiffs from taking positions in litigation inconsistent with those taken in prior bankruptcy proceedings. *See, e.g, Krystal*, 337 F.3d at 320, 324 (judicial estoppel bars plaintiff from asserting claims that it failed to disclose in prior bankruptcy proceeding); *Hardee-Guerra v. Shire Pharmaceuticals*, 737 F. Supp. 2d 318, 331-32 (E.D.Pa. 2010) (judicial estoppel bars plaintiff from seeking compensatory damages in later litigation because of failure to disclose claim in prior bankruptcy proceeding); *Castillo v. Coca-Cola Bottling Co. of Eastern Great Lakes*, CIV.A. 06-183, 2006 WL 1410045, at \*4 (E.D.Pa. May 22, 2006) (same).

Under the judicial estoppel doctrine, courts consider whether (1) the party to be estopped has taken "irreconcilably inconsistent" positions; (2) the party to be estopped has acted in "bad faith"; and (3) a finding of estoppel would be "tailored to address the harm identified" such that "no lesser sanction would adequately remedy damage done by the litigant's misconduct." *Krystal*, 337 F.3d at 320.

All three elements are met here.  *First*, Fleming's failure to identify its purported oral contract to the Bankruptcy Court—only months after it claims the contract was formed—is "irreconcilably inconsistent" with its breach of contract claim in the instant action.  *Id.* at 320-21 (plaintiff's claims in litigation were "irreconcilably inconsistent" with failure to disclose those same claims in a Chapter 11 filing).  *Second*, Fleming has acted in bad faith: either Fleming intentionally misled the Bankruptcy Court in order to hide potential income, or it is intentionally misleading the Court now.  *See id.* at 321 (bad faith inferred when party has knowledge of a claim and a "motive to conceal" that claim).  *Third*, estoppel is tailored to address the harm

identified, as it is "necessary to prevent [Fleming] from profiting from its omission." *Id.* at 325. Judicial estoppel thus bars Fleming's breach of contract claim.

### D.  Neither Cody Hoff Nor Chris Surles Had Authority to Bind Jacobs to the Oral Contract Alleged

The doctrines of actual and apparent authority provide yet another independent ground requiring a grant of summary judgment.

As detailed above, Fleming alleges that the purported oral contract was formed in a telephone conversation with Cody Hoff and Chris Surles. SOF ¶ 95.  Neither gentleman, however, had actual authority to bind Jacobs to the oral contract alleged by Fleming. SOF ¶¶ 103-104.  *See Clark Resources, Inc. v. Verizon Business Network Services, Inc.*, 1:10-CV-1119, 2012 WL 1339697, at *6 (M.D.Pa. Apr. 18, 2012) ("In the absence of any evidence of record to the contrary, the Court must accept [the employee's] affidavit that she did not have the authority to bind Defendant as true and conclude that Plaintiff has failed to establish that [the employee] had the actual authority to enter into an oral agreement on Defendant's behalf.").

Nor is there any evidence that either Mr. Hoff or Mr. Surles had *apparent* authority to bind Jacobs.  "Apparent authority exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise." *Washburn v. N. Health Facilities, Inc.*, 121 A.3d 1008, 1015 (Pa. Super. 2015).  Importantly, the burden of establishing the existence of apparent authority rests with the party asserting it.  *Clark Resources*, 2012 WL 1339697, at *7.

It is well-settled in Pennsylvania that apparent authority can only result from a manifestation of the principal (here, Jacobs) —not the agent.  *See D & G Equip. Co. v. First Nat'l Bank,* 764 F.2d 950, 954 (3d Cir. 1985) ("Under Pennsylvania law, apparent authority flows from the conduct of the principal and not from that of the agent.").  Importantly, ***an***

***agent's title or status does not confer apparent authority***.  *See Jennings v. Pittsburgh Mercantile Co.*, 202 A.2d 51, 54, 414 Pa. 641, 645–46 (Pa. 1964) ("[T]he corporate offices of Vice-President and Treasurer-Comptroller . . . do not provide the basis for a reasonable inference that [the principal] held out [the agent] as having the apparent authority . . . .").  Rather, a party must point to "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."  *Clark Resources*, 2012 WL 1339697, at *8 (emphasis added).

Fleming can point to no such conduct by Jacobs.  *See id.* at *10 ("Plaintiff's contention that [the agent] had the apparent authority to make such an agreement is unsupported by any evidence that Defendant held her out to Plaintiff in such a way as to support a reasonable inference that she had the authority to make a multi-million dollar oral contract.").  Because the factual record establishes that neither Mr. Hoff nor Mr. Surles had actual or apparent authority to bind Jacobs to the oral contract alleged by Fleming, no reasonable jury could conclude that an oral contract was formed.

### E.  There Can Be No "Contract" Pertaining to Project 3027 Because Project 3027 Did Not Exist When the Alleged Contract Was Formed

Fleming alleges that the "oral contract" was formed sometime between May and June of 2011. SOF ¶ 94.  As the undisputed facts show, this purported contract plainly did not contemplate Project 3027.  Mr. Kohn himself testified the conversations during which the contract allegedly was formed ***concerned only Project 3010.*** SOF ¶ 111.  In fact, the parties did not even know about Project 3027 when the alleged contract was formed: NAVFAC did not issue the Project 3027 Task Order until October 2012, Cody Hoff did not learn about Project 3027 until late 2012, and he first told Mr. Kohn about it in January 2013. SOF ¶¶ 58-62.  The

alleged oral contract thus necessarily concerned only Project 3010.  Fleming's breach of contract claim vis-à-vis Project 3027 cannot survive summary judgment.

### III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON FLEMING'S NEGLIGENT MISREPRESENTATION CLAIM

Fleming also alleges that Jacobs made actionable misrepresentations when it stated that NAVFAC had agreed to the sole-source.  *See* Second Am. Compl. (Count II).  Under Pennsylvania law, a negligent misrepresentation claim has four elements: "1) a misrepresentation of a material fact; 2) made under circumstances in which the misrepresenter ought to have known its falsity; 3) with an intent to induce another to act on it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Smith v. Lincoln Ben. Life Co.*, 395 Fed. Appx. 821, 824, 2010 WL 3730196, at *3 (3d Cir. 2010).

Here, Fleming's negligent misrepresentation claim fails as a matter of law because (i) the claim is barred under Pennsylvania's economic loss doctrine, and (ii) Fleming's reliance on Jacobs' alleged misrepresentations was not "justifiable."  In the alternative, the Court should grant partial summary judgment limiting Fleming's available damages, for the additional reasons below.  Such a ruling on damages will not only truncate the issues for trial, but may also may aid in averting a trial altogether.

### A.  The Economic Loss Doctrine Bars Fleming's Negligent Misrepresentation Claim

Pennsylvania's economic loss doctrine bars Fleming's negligent misrepresentation claim because Fleming has not suffered physical injury or property damage.  Under the doctrine, "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pennsylvania*, 985 A.2d 840, 841 n.3 (Pa. 2009).

In *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, the Pennsylvania Supreme Court recognized an exception to the economic loss doctrine for certain negligent misrepresentation claims, adopting Section 552 of the Restatement (Second) of Torts.  866 A.2d 270, 288 (Pa. 2005).  But this exception is narrowly construed; it applies only where the defendant is in the business of selling ***the type of information allegedly relied upon***.  *See Bilt-Rite Contractors*, 866 A.2d at 482 (adopting Section 552 "in cases where information is negligently supplied by one in the business of supplying information").

Here, each of the alleged misrepresentations concerned Fleming's sole-source status. Jacobs, however, is an architectural and engineering firm, not a law firm.  Jacobs is not in the business of selling advice or information about the FAR or the Navy's contracting rules and regulations. SOF ¶ 125.  Pennsylvania's economic-loss doctrine bars Count II.

### B. Fleming's Reliance on Jacobs' Alleged Misrepresentations Is Not Justifiable as a Matter of Law

The record on summary judgment establishes that Fleming could not have "justifiably" relied upon Jacobs' alleged misrepresentations about the status of NAVFAC sole-sourcing the hangar doors to Fleming.  Seth Kohn knew that, in order to finalize the sole-source to Fleming, NAVFAC needed to sign the J&A. SOF ¶ 116.  But there no allegation in this case—much less any evidence—that Jacobs ever told Fleming that NAVFAC had signed the J&A.  And if Mr. Kohn had wanted to know whether NAVFAC had in fact signed it, he could have found the answer for himself by either asking NAVFAC directly or by checking publicly available listings of all awarded J&As.  He did neither.

"To be justifiable, reliance upon the representation of another must be reasonable." *Standefer v. T. S. Dudley Land Co.*, 3:09-CV-1115, 2010 WL 11534333, at \*10 (M.D.Pa. July 14, 2010) (citing *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002)).  Courts consider "the

degree of sophistication of the parties" when evaluating the reasonableness of reliance and reasonableness can be adjudicated, based on undisputed facts, at the summary judgment stage. *See Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d 544, 552-53 (W.D.Pa. 2003) (granting summary judgment in favor of defendants on misrepresentation claim because reliance by an "experienced business person" was not reasonable as a matter of law); *see also Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408, 420 (W.D. Pa. 2009) (same).

Similarly, reliance on a defendant's representation is not "reasonable" where the information is publicly available, or where parties have equal access to information. *See Emery v. Third Nat. Bank of Pittsburgh*, 162 A. 281, 283 (Pa. 1932) (reliance not reasonable where "the means of knowledge are at hand, and equally available to both parties" (internal quotations omitted)); *Haymond v. Lundy*, 99-5015, 2000 WL 804432, at *5 (E.D. Pa. June 22, 2000), *aff'd sub nom.*, *Lundy v. Hochberg*, 79 Fed. Appx. 503 (3d Cir. 2003) (unpublished) ("no person of ordinary prudence would have relied" where information "was available in accessible publications").

The following undisputed facts demonstrate that Fleming's reliance on Jacobs' representations were not justifiable as a matter of law.

### 1. Fleming Is a Sophisticated Actor Whose President Was Familiar with the FAR

Fleming is a sophisticated government subcontractor with decades of experience designing and fabricating hangar door systems for the U.S. military, including NASA, Air Force One, the Army Corps of Engineers, the U.S. Air Force, and the U.S. Navy. SOF ¶ 112.  At his deposition, Mr. Kohn admitted his familiarity not only with the FAR generally, but ***specifically with the FAR's requirement that a J&A must be signed by NAVFAC*** in order to finalize a sole-source. SOF ¶¶ 113-114.  At another point in his deposition, Mr. Kohn testified that he knew

early in his dealings with Jacobs about Project 3010 that "until paperwork is generated and signed [by NAVFAC], [a sole-source] is not 100 percent official." SOF ¶ 116.  Mr. Kohn thus knew that Jacobs' statements that NAVFAC had "agreed" to the sole-source could not bind NAVFAC to a sole-source award.

### 2.  *Mr. Kohn Could Have—But Did Not—Confirm the Status of the J&A*

At any point before May 2014, Mr. Kohn could have confirmed for himself the status of the J&A for the sole-source to Fleming.  Because the FAR requires J&As to be posted publicly, Mr. Kohn could have checked the relevant federal procurement website to confirm whether the J&A had been finalized. SOF ¶ 117.  Alternatively, Mr. Kohn could have simply contacted NAVFAC to verify whether the sole-source had been finalized.  NAVFAC's general counsel informed OGS—the lobbying firm hired by Fleming—that Fleming was free to interact "directly with DON [Department of Navy] officials during development of the specifications and solicitations." SOF ¶ 119.  Mr. Bidwell added, "We are aware of nothing that would have prevented such communication." SOF ¶ 120.  Mr. Kohn never did.  SOF ¶ 118.

In sum, there is no genuine dispute of fact that Fleming is a sophisticated actor whose president knew that the FAR requires a signed J&A in order to approve a sole-source award.  There also is no genuine dispute of fact that Mr. Kohn could have confirmed for himself whether a J&A had been signed before performing any work, but failed to do so.  Mr. Kohn's decision to rely on the allegedly negligent statements by Jacobs about whether Fleming had received the sole-source designation—when he had the knowledge and ability to verify that information himself—is unjustifiable as a matter of law.

### C.  Fleming's Damages Are Limited To Its Concrete Pecuniary Losses Incurred After September 12, 2011

Pennsylvania law sharply limits Fleming's potential recoverable damages on its negligent misrepresentation claim.  Under Pennsylvania law, Fleming's damages are limited to pecuniary losses proximately caused by an alleged misrepresentation.  *See* Restatement (Second) of Torts § 552B.  This principle has several implications: (1) Fleming cannot recover expectancy damages; (2) Fleming can only recover for its "actual loss"—not what it contends is the fair market value of the designs and services it provided Jacobs; and (3) Fleming's maximum recoverable damages for this claim are its concrete pecuniary losses incurred *after* September 12, 2011.

### 1.  *Fleming Cannot Recover Expectancy Damages*

Fleming seeks to recover, as negligent misrepresentation damages, its expected profits had it ultimately won the contract to build the hangar doors. SOF ¶ 128.  But Pennsylvania law is clear: plaintiffs may not recover expectation damages for negligent misrepresentations. The Restatement (Second) of Torts § 552B, which has been endorsed by the Third Circuit, provides,

> The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including: (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

*See Brand Mktg. Group LLC v. Intertek Testing Services*, *N.A., Inc.*, 801 F.3d 347, 356 (3d Cir. 2015) (endorsing Restatement (Second) of Torts § 552B).[4]

Comment b to § 552B emphasizes that there is "no liability for merely negligent conduct that interferes with or frustrates a contract interest or an expectancy of pecuniary advantage."

---

[4] The Third Circuit in *Brand Marketing Group* permitted plaintiff to recover its lost profit damages from a contract with a third party; however, in that case, unlike here, the defendant's negligent misrepresentation caused plaintiff to lose its contract (and thus its profits) with that third party.

Restatement (Second) of Torts § 552B cmt. b; *see also Torres v. Borzelleca*, 641 F. Supp. 542,

546 (E.D.Pa. 1986) ("Section 552B makes it clear that in a negligent misrepresentation action,

the plaintiff cannot recover damages for loss of an expectancy of a pecuniary advantage.");

*Solarchick ex rel. Solarchick v. Met. Life Ins. Co*., 430 F. Supp. 511, 514 (W.D.Pa. 2006)

("expectation damages . . . are not appropriate in a tort action"); *Killian v. McCulloch*, 850 F.

Supp. 1239, 1252 (E.D.Pa. 1994) ("[U]nder Pennsylvania law, in an action based on fraud, the

measure of damages is actual loss, and not the benefit, or value, of that bargain." (internal

citations omitted)).

Here, Fleming's "expectation" damages are what it hoped to be paid for actually

constructing the hangar doors, which it never did.  Pennsylvania law precludes recovery of such

damages on a claim for negligent misrepresentation.

### 2.  *Fleming Cannot Recover the "Value" of Its Designs*

Additionally, under Pennsylvania law, a party may recover only its actual loss acting in

reliance on a misrepresentation.  *See* Restatement § 552B ("The damages recoverable for a

negligent misrepresentation are those necessary to compensate the plaintiff for the **pecuniary**

**loss to him** . . . " (emphasis added)); *Hedges v. Primavera*, 218 F. Supp. 797, 802 (E.D.Pa. 1963)

("The measure of damages in this action is the plaintiff's actual loss" (citing *Peters v.*

*Stroudsburg Trust Co.*, 348 Pa. 451, 35 A.2d 341 (1944))); *Kaufman v. Mellon Nat. Bank &*

*Trust Co.*, 366 F.2d 326, 331 (3d Cir. 1966) ("In an action based upon fraud the purchaser is

entitled to recover his actual loss . . . .").  Fleming's "actual loss," by definition, does not include

the "fair market value" of Fleming's hangar door designs and services.  Fleming's damages, as a

matter of law, are thus limited to its concrete pecuniary losses that is has sustained—not the

theoretical value of these designs on the market.[5]

### 3. Fleming Cannot Recover for Losses Incurred Before the First Alleged Misrepresentation

Finally, because an alleged misrepresentation must be the proximate cause of Fleming's

damages, it is axiomatic that Fleming cannot recover for damages incurred **before** Jacobs'

earliest alleged misrepresentation.  As there is no dispute that the earliest alleged

misrepresentation was on September 12, 2011, Fleming cannot recover any damages for losses

incurred before that date.

Under Pennsylvania law, "[t]he plaintiff must . . .  establish that the negligent

misrepresentations were the proximate cause of his injuries."  *Luther*, 676 F. Supp. 2d at 419

(W.D.Pa. 2009); *see also* Restatement § 552B ("The damages recoverable for a negligent

misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of

which the misrepresentation is a legal cause . . . .).  Unsurprisingly, courts readily dismiss claims

for damages that have been incurred prior to the misrepresentation at issue.  *Marshall v.

Fenstermacher*, 388 F. Supp. 2d 536, 550 (E.D.Pa. 2005) (dismissing fraud claim where "all of

the alleged intentional and inferential misrepresentations were made *after* [the plaintiff suffered

damages]" (emphasis in original)); *Bobin v. Sammarco*, CIV. A. 94-5115, 1995 WL 303632, at

*4 (E.D.Pa. May 18, 1995) (holding that "Plaintiffs cannot claim as actual damages [the losses]

they incurred before Defendants made the alleged misrepresentations").[6]

---

[5] For further reasons described in Section IV *infra*, Fleming also cannot recover for the "value" of its designs or services because its damages are highly speculative.

[6] *See also Partners Coffee Co., LLC v. Oceana Services & Products Co.*, 700 F. Supp. 2d 720, 734 (W.D. Pa. 2010) (negligent misrepresentation claim dismissed because alleged misrepresentations occurred after the plaintiffs incurred losses and "therefore could not have been intended to induce them to act").

The first representation by Jacobs to Fleming that the Navy had agreed to sole-source the hangar door project was on September 12, 2011. SOF ¶ 121.  Fleming identifies no earlier misrepresentation in its Second Amended Complaint, nor could Mr. Kohn identify any during his deposition. SOF ¶ 122.  In fact, up until September 12, 2011, Mr. Kohn emailed Jacobs repeatedly to inquire about whether the sole-source had been approved—a clear indication that he knew it had not been. SOF ¶¶ 123-124 (9/12/11 email from Mr. Kohn to Jacobs: "Fleming certainly would like to be on board for [Project 3010] . . .  Has the Government made any decisions yet regarding [sole-sourcing] the large blast doors?").  Consequently, Fleming cannot recover negligent misrepresentation damages for work it performed before September 12, 2011 and—at a minimum—partial summary judgment should be entered on this issue.

### D.  The Court Should Grant Summary Judgment on Fleming's Claim for Punitive Damages

Under Pennsylvania law, "the burden is on the plaintiff to prove damages." *Wu v. Arouh*, 14-CV-03902, 2016 WL 9776072, at *2 (E.D.Pa. May 3, 2016).  For a plaintiff to recover punitive damages, a defendant's actions must be "so outrageous as to demonstrate willful, wanton or reckless conduct."  *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770, 582 Pa. 114, 121 (Pa. 2005).  Where, as here, there is no evidence that the defendant has acted wantonly or recklessly, courts will dismiss punitive damages on summary judgment.  *See Marsh v. Norfolk S., Inc.*, 243 F. Supp. 3d 557, 567, 573 (M.D.Pa. 2017) (dismissing punitive damages on summary judgment because "[n]othing in the record is capable of ascertaining that [the defendant] exhibited conscious indifference to the perpetration of the wrong . . . or was reckless in his disregard of the danger" (internal quotations omitted)); *Mieczkowski v. Salvation Army*, 3:15CV2146, 2017 WL 282892, at *3 (M.D.Pa. Jan. 23, 2017) (dismissing punitive damages on

- 26 -

summary judgment because "no evidence has been submitted to sufficiently establish punitive damages").

The record is devoid of any evidence that Jacobs' conduct here was "outrageous." To the contrary, the record reflects Cody Hoff's and Chris Surles' belief that Fleming would be the sole-source provider of the hangar door.  SOF ¶¶ 126-127.  And there was ample basis for that belief: (i) Jacobs sent NAVFAC a ROM budget for Project 3010 indicating that Fleming would supply the hangar doors, which NAVFAC received and reviewed (SOF ¶¶ 30-36); (ii) NAVFAC specifically requested a J&A memorandum from Fleming, which Jacobs forwarded to NAVFAC (SOF ¶¶ 41-44); (iii) Jacobs submitted hangar door specifications to NAVFAC identifying Fleming as the sole-source supplier of the hangar doors, which NAVFAC received and reviewed (SOF ¶¶ 48-52) (iv) the Project 3010 bid package submitted to NAVFAC by Jacobs included, with NAVFAC's knowledge and approval, the J&A designating Fleming as the sole-source supplier of the hangar doors (SOF ¶¶ 45-48); and (v) during the years of project delay, NAVFAC never informed Jacobs that the sole-source had not been granted. SOF ¶ 57.  There simply is no evidence that Jacobs' conduct towards Fleming was "outrageous" in any respect, thus precluding an award of punitive damages.  *See Hutchison*, 870 A.2d at 770.

### E.  The Court Should Grant Summary Judgment on Fleming's Negligent Misrepresentation Claim Pertaining to Project 3027

Finally, Fleming cannot prove negligent misrepresentation with regard to Project 3027, for two reasons.  *First*, because the Project 3027 hangar door specifications are identical to the Project 3010 hangar door specifications, Fleming performed no work on (and thus incurred no damages for) Project 3027. SOF ¶ 63.  *Second*, Jacobs made no alleged misrepresentations to Fleming ***about Project 3027***. *See* SOF ¶ 64 ("Q: With respect to Project 3027, did you personally, at any time to your recollection, ever tell Mr. Kohn or anybody else at Fleming that

the Navy had approved Fleming for a sole-source with respect to 3027? A. No, not to my

knowledge."). For these reasons, Fleming's negligent misrepresentation claim (Count II) cannot

survive summary judgment as a matter of law.[7]

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON FLEMING'S UNJUST ENRICHMENT CLAIM

Under Pennsylvania law, the elements of unjust enrichment are: "(1) benefits conferred

on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and

retention of such benefits under such circumstances that it would be inequitable for defendant to

retain the benefit without payment of value." *Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533

F.3d 162, 180 (3d Cir. 2008). The measure of unjust enrichment damages is "the reasonable

value of the services rendered to the defendant. Restated, the accepted measure of damages in an

unjust enrichment claim is ***the gain to the defendant***, not the loss to the plaintiff." *Calgon*

*Carbon Corp. v. ADA-ES, Inc.*, CIV.A. 08-1355, 2010 WL 2985947, at *1 (W.D.Pa. July 27,

2010) (emphasis added).

Summary judgment should be granted on Fleming's unjust enrichment claim, for two

reasons: (1) Fleming has failed to adduce evidence quantifying the "reasonable value" of its

services; and (2) establishing the "reasonable value" of Fleming's services requires expert

testimony, which Fleming does not have.

---

[7] In opposition to the instant motion, Fleming likely will rely on the deposition testimony of several NAVFAC employees whose testimony has vacillated on the question of whether the Navy had agreed with Jacobs that the hangar doors should be sole-sourced to Fleming. But the record is clear that (i) NAVFAC received Fleming's ROM for Project 3010 indicating that Fleming—and Fleming alone—would supply the hangar doors, and (ii) NAVFAC received and reviewed the specifications identifying Fleming as the sole-source supplier of the hangar doors and did not object to Fleming's inclusion. Regardless, none of Jacobs' summary judgment arguments turn on whether NAVFAC in fact agreed to the Fleming sole-source.

### A.  Fleming Has Not Quantified the Value of Its Services

It is well-settled that a party must prove its damages "with reasonable certainty."  *See Rossi v. Schlarbaum*, CIV.A. 07-3792, 2009 WL 722297, at *3 (E.D.Pa. Mar. 18, 2009). Fleming has not quantified—and now cannot, because fact and expert discovery are over—the reasonable value of its services to Jacobs.

Ordinarily, courts will not dismiss claims on summary judgment where there is uncertainty with respect to the amount of damages.  *See id*.  But where, as here, there is ***no record evidence whatsoever establishing the quantum of damages***, courts will grant summary judgment.  *See, e.g.*, *Inoff v. Craftex Mills, Inc.*, CIV. A. 06-3675, 2007 WL 4355385, at *13 (E.D.Pa. Dec. 11, 2007) (granting summary judgment to defendant where plaintiff had not "explained or provided evidence showing what these benefits were, how they were conferred, or their dollar value" to prove unjust enrichment claim); *Glover v. Udren*, CIV. 08-990, 2014 WL 4348078, at *15 (W.D.Pa. Sept. 2, 2014) (granting defendant's motion for summary judgment where plaintiff provided "no evidence . . . that [the defendant] been unjustly enriched"); *see also Paraxel Int'l Corp. v. Feliciano*, No. 04–CV–3798, 2008 WL 2704569, at *7 (E.D.Pa. July 3, 2008) (granting summary judgment on breach of contract claim because plaintiff presented no evidence that it had suffered damages).

During discovery, Fleming produced no evidence about the "reasonable value" of its services.  Jacobs served an interrogatory asking Fleming to "set forth with specificity the amounts and categories of damages You are seeking in this action, and describe how they are calculated"; Fleming refused, instead stating only that "in the event that Fleming does not prevail on Counts I or II, Fleming seeks to recover in quantum meruit for the value of its services [in the

- 29 -

same amounts as its lost profits damages]." SOF ¶¶ 128-130.  This is insufficient to create a genuine issue of material fact for summary judgment.

**B.  Establishing the Reasonable Value of Fleming's Services Requires Expert Testimony**

In addition to its failure to adduce evidence in discovery quantifying the value of its services, Fleming also has failed to designate any expert opinion about the value of its services. Expert evidence is necessary "when an issue is beyond the ken of a lay jury."  *McMunn v. Babcock & Wilcox Power Generation Group, Inc.*, 869 F.3d 246, 267 (3d Cir. 2017). Where a plaintiff has not provided expert evidence on an issue "beyond the ken of an average layman," courts will grant summary judgment.  *See, e.g.*, *Young v. Com. Dept. of Transp.*, 744 A.2d 1276, 1279, 560 Pa. 373, 379 (Pa. 2000) (affirming grant of summary judgment in favor of appellants because of lack of expert testimony); *Davis v. United States*, NO.: 3:07-CV-00566, 2010 WL 11553202, at *10 (M.D.Pa. June 10, 2010) (granting summary judgment in favor of defendant because plaintiff did not adduce expert evidence necessary to establish issues which were "not obvious and not within the knowledge and experience of an ordinary layman).

Calculating the reasonable value of Fleming's services to Jacobs —i.e., the fair market value of its work on blast-rated hangar door designs and specifications for a U.S. military aircraft hangar—requires specialized knowledge.  Fleming's failure to designate an expert on the value of its services is, by itself, an evidentiary failure that bars recovery of such damages.  Summary judgment should be granted on Count VI.

**<u>CONCLUSION</u>**

For the foregoing reasons, summary judgment should be granted to Jacobs on all claims.