## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FLEMING STEEL CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 16-727 |
| | ) | Judge Nora Barry Fischer |
| JACOBS ENGINEERING GROUP, INC., | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.  INTRODUCTION

This diversity action arises from a business arrangement between an architectural/engineering design management company, Defendant Jacobs Engineering Group ("Jacobs"), and a manufacturer which specializes in the custom design and fabrication of hangar doors, Plaintiff Fleming Steel Company ("Fleming"), involving the procurement of two Navy projects for the construction of an aircraft hangar at Andersen Air Force Base in Guam.  After the Navy failed to approve Fleming as the sole source for the manufacture of a component part— the blast-rated hangar doors, Fleming initiated this action against Jacobs seeking damages and restitution on various claims.  At this juncture, the only remaining claims consist of breach of an oral contract, negligent misrepresentation, and unjust enrichment.  Currently pending before the Court is Jacobs' Motion for Summary Judgment (ECF No. 75) as to the remaining claims.  For the reasons that follow, the Court will grant Jacobs' motion in part, and deny it in part.

### II.  LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

### III. FACTUAL BACKGROUND

In 2010, the United States Naval Facilities Engineering Command ("NAVFAC") awarded Jacobs/Burns & McDonnell (the "Joint Venture" or "Jacobs") an Indefinite Delivery Indefinite Quantity ("IDIQ") contract to provide Architectural/Engineering ("A/E") services for the construction of aviation facilities within the U.S. Pacific Command Area of Responsibility. *See* Dep. of Cody Hoff (Hoff Dep.) at 12-13, Def.'s App. Ex. 1 (ECF No. 75-2)[1]; IDIQ contract, Pl.'s App. Ex. A (ECF No. 87-1). In February 2011, NAVFAC-Marianas (a branch of NAVFAC within NAVFAC Pacific Command) awarded the Joint Venture a task order for Project AJJY123010, Guam Fuel Systems Maintenance Hangar ("Project 3010") to provide A/E services

---

[1] Unless otherwise noted, the citations to Cody Hoff's deposition are contained in Defendant's Appendix, Exhibit 1, at ECF No. 75-2.

in connection with the design of a hangar at Andersen Air Force Base in Guam. *See* Ex. 2 to Hoff Dep. ([ECF No. 75-2 at 52-54](#)). Project 3010 is what is known as a "design-bid-build" project; in design-bid-build projects, the A/E first prepares a full set of design plans and the project specifications, and the government then releases the plans and specifications to the public so that potential contractors may submit bids for the project construction. Hoff Dep. at 25; Dep. of John DeVenecia ("DeVenecia Dep.") at 25-26, Pl.'s App. Ex. CC ([ECF No. 87-29](#)). The contractor is just being asked to build the facility and not do any design work for it. DeVenecia Dep. at 26.

The Project 3010 hangar required, among other components, blast-hardened hangar doors. Dep. of Chris Surles ("Surles Dep.") at 20, 36, Def.'s App. Ex. 2 ([ECF No. 75-3](#)). Those doors were a "performance specification" item: the doors had to meet certain operational criteria, but the means of meeting the required criteria are left up to the subcontractor who ultimately builds the doors. Hoff Dep. at 21-22.

Jacobs reached out to potential hangar door manufacturers to assist it with the design of the blast-hardened hangar doors. Hoff Dep. at 21. Jacobs contacted Fleming Steel Company ("Fleming") for design-assist type conceptual work because Fleming had designed hangar doors previously. Surles Dep. at 21-22. Manufacturers have an incentive to assist A/E firms such as Jacobs in this regard because in doing so, they will obtain cost and other information which will give them an advantage in bidding on the project. *Id.* at 22-23.

Cody Hoff, who was employed by Jacobs, was the project manager for Project 3010, and later for Project 3027. Hoff Dep. at 7, 10. Chris Surles, who was also employed by Jacobs Engineering Group, was the architectural intern for Project 3010 and the project architect for Project 3017. Surles Dep. at 6, 8. John DeVenecia was the NAVFAC's Design Manager for

Project 3010 from August 2010 until July 2012, and Mr. Hoff's principal point of contact on Project 3010. DeVenecia Dep. at 9-10. Clarence Lagutang was NAVFAC Marianas CI, Capitol Improvement Project Manager on Project 3010. Dep. of Clarence Lagutang ("Lagutang Dep.") at 7 (ECF No. 75-5).

Fleming has over 90 years of experience custom designing and fabricating specialized and unique aircraft hangar door systems for the United States Military (including Air Force One). Second Am. Compl., ¶ 1 (ECF No. 34). Seth Kohn is the president and owner of Fleming. Dep. of Seth Kohn ("Kohn Dep.") at 9. Mr. Kohn was Jacobs' principal point of contact at Fleming on the issue of sole sourcing for the Projects. *Id.* at ¶ 36. Mr. Kohn has been employed at Fleming since 1967. *Id.* at ¶ 10.

In May of 2011, Jacobs contacted Fleming about assisting in the development of the hangar door design concept for Project 3010. Hoff Dep. at 41-42. Jacobs and its blast consultant, ARA, with whom the Joint Venture had a subcontract for Project 3010, had already come up with a design concept for the hanger doors—Option 1—which was not an optimal solution at that time. *Id.* at 36, 38-40. On May 9, 2011, Bernie Klein from Jacobs emailed Mr. Kohn attaching Option 1 and asked Mr. Kohn to email him some details that they discussed so that Mr. Klein could develop Option 2. Ex. P 3 to Hoff Dep., Pl.'s App. Ex. J (ECF No. 87-10). Shortly thereafter, a telephone conference took place in which Mr. Hoff, his architects and the blast consultant discussed with Mr. Kohn the initial concepts of the project, and generally talked about the design details of the hanger doors, particularly the bottom rail.[2] Hoff Dep. at 42-44, Pl.'s App. Ex. FF (ECF No. 87-32).

---

[2]     The "big" design issue was how to construct the bottom rail of the hangar doors such that it would be able to operate after a blast:
        Q: So why was the bottom rail so important?

During May, June, and July of 2011, Jacobs and Fleming collaborated to develop hanger door concept designs, including designs for the hangar door head. Dep. of John Gavroy ("Gavroy Dep.") at 31-35; Various Emails between Gavroy and Surles, Exs. 6-9 to Gavroy Dep., Def.'s App. Ex. 7 (ECF No. 75-8 at 23-43). Mr. Kohn testified that during the May to July 2011 timeframe, Fleming provided significant design services to Jacobs:

> Q: Okay. So during this time frame, based on the e-mails we looked at before the lunch break, what did this -- my math indicates that there are 609.5 hours reflected on page 1 of Exhibit 43. What did those 609.5 hours consist of?
>
> A: Well, there was engineering and -- and -- there was a variety of things that were discussed and done. Part of it was design. Part of it was specifications. Part of it was concept. Part of it was debunking what they had already started with. I spent a tremendous amount of time when they first contacted me looking at what they thought was going to be workable. There's no way possible.
> So there's a lot that goes into it. It's not all concentrated. A lot of it is interrelated. There was a lot of time spent with the structural engineer on the interface between the door head and the sill. A lot of time spent with the blast engineer. A lot of time spent with Jacobs about how to pull all this together. So there -- there was a considerable amount of work done.

Kohn Dep. at 139-140, Pl.'s Ex. GG (ECF No. 87-33).[3]

Jacobs received plans from Fleming and utilized this information when preparing the plans for the Navy's Request for Proposals ("RFP"). Hoff Dep. at 34-35, Pl.'s App. Ex. FF

---

> A: That's because the door had to be able to be able to operate after the event happens. That was one of our criteria, that it had to be able to be opened either manually or some way, they had to be able to take the door out of -- so they could get whatever asset that was in the facility that was being protected out to -- to do whatever it needed to do.

Hoff Dep. at 36-37.

[3] The parties disagree as to whether the design of the hanger doors was to be developed after the bidding by the hangar door manufacturer who actually wins the construction subcontract, *see* Defendant's Concise Statement of Material Facts that are Undisputed or Assumed to be True for Summary Judgment Purposes ("Def.'s CSMF") at ¶ 8 (ECF No. 98), or whether Jacobs was responsible for providing a full design of the hangar doors since this project was a design/bid/build contract, *see* Plaintiff's Responsive Concise Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Resp. CSMF") at 8 (ECF No. 90).

(ECF No. 87-32).  Fleming's work also included preparation of fabrication drawings for the hangar doors.  Kohn Dep. at 38.  Mr. Hoff testified that the plans and specifications included in the solicitation for the Navy projects incorporated "useful" and "valuable" input from Fleming.  Hoff Dep. at 65.

At the end of July 2011, Mr. Kohn informed Jacobs that Fleming could no longer support Jacobs without compensation.  In this regard, Mr. Hoff testified:

> Q:  Okay. Now, in this E-mail [from Jim Brokaw of ARA dated 7/22/11], you say that Fleming has reached the end of the financial donation to the project. They asked if we could discuss a sole source to them from the government due to this being the first door of its kind and the sensitive nature of the load data. Jacobs support this stance, unless you feel we can write the performance spec based on the current concept that could be competitively bid, which would have to include the load data. Now, when you said that Fleming has reached the end of the financial donation to the project, what do you mean by that?
>
> A:  It was we were informed by Mr. Kohn that they could no longer support us without being compensated.
>
> Q:  And do you think Mr. Kohn was being reasonable when he said that?
>
> A:  Yes.
>
> Q:  And why so?
>
> A:  Because he – he had helped us and we understood there would be a limit to what they can do as part of the standard door assist, like we discussed previously in this deposition. And we knew at some point, that they would not be able to assist any further.
>
> Q:  Okay. And here it says that Fleming was asking whether or not they could be considered a sole source from the government, given that, you know, they were reaching the financial end for donation to the project.
>
> A:  Uh-huh.
>
> Q:  Were you supportive of that concept?

A: Yes. And as I stated – as I stated here, and to – that they would be. And I wanted to get with – to Jim to make sure he agreed with that as well.

Q: And did he?

A: Yes, because at that time, the key point to all of this was the load data. But by that time, we were told that load data was classified, we couldn't put it out in a public spec. So we really couldn't – we couldn't put out a performance spec and not tell the hangar door designers what they had to – loads they could design to. It would be impossible to design the – for them to design and fabricate a door.

Q: And it's also fair to say that if you're – Fleming was going to continue to provide its support in the design of the hangar doors, that you would expect them to be compensated in some way?

A: No, I would – I would – it would be part of their sole source.

Q: So when we talk about compensation, one way to receive compensation would be getting that sole source designation in the solicitation correct?

A: Yes, that would be one way.

Hoff Dep. at 68-71; Ex. P6 to Hoff Dep. (ECF No. 75-2 at 86).

Mr. Hoff further testified:

Q: And when Fleming continued to provide design support to Jacobs after this July 22nd, 2011 E-mail, was it your understanding or assumption that Fleming would be sole sourced to contract the hangar doors?

A: Based on our discussion, it was the agreement in -- I think it was September when we had our OBR -- onboard review meeting with NAVFAC in Guam -- the agreement in -- was that they all agreed that a sole source was -- was the best path forward. However, additional documentation for a ROM, et cetera, that was requested by NAVFAC from Fleming and the J&A paperwork -- subsequent J&A paperwork would have to be prepared first.

Q: And so that meeting you referred to was in what month and year?

A:  September of 2011.

Q:  And so was Fleming a participant in that September 11th, 2011 meeting?

A:  No, they did not.

Q:  So after that September 2011 meeting, you walked away from that meeting confident that the Navy would allow Fleming to be a sole source supplier of the hangar doors?

A:  Yes.

Q:  And were you highly confident, or fairly confident?

A:  I had no reason to doubt that they would not be allowed to be -- that the J&A would not be approved.
. . .

Q.  . . .  And so when Jacobs told Fleming that the Navy had agreed to sole source the hangar doors to Fleming, that was told to Fleming in order to encourage Fleming to continue to provide design services?

A:  No, it was not.  It was told to them to be able to help prepare the J&A for their product and the ROM calls that NAVFAC requested.  I don't – I don't recall much additional effort required by Fleming at that point after that – after that meeting, besides preparing the J&A, and the ROM call system that they submitted to NAVFAC is to document the Justification and Authorization.

Hoff Dep. at 71 -73, 153-54 (Pl.'s Ex. FF).[4]

On July 29, 2011, Mr. Surles informed Mr. Kohn by email that Jacobs had raised with NAVFAC "the possibility of using Fleming as a sole-source for the Hangar Doors. NAVFAC is in favor of providing this due to the uniqueness of the design, the confidentiality of the blast criteria, and the required finished product compared to competitively bidding the doors[,]" and

---

[4]     According to Mr. Kohn, the reason why Fleming provided design services beyond the initial design concept was because Jacobs had agreed to get Fleming "sole-sourced" with the Navy.  Kohn Dep. at 115-16.

that Jacobs was awaiting NAVFAC's response.  Surles' Dep. Ex. 37, Def.'s App. Ex. 2 (ECF No. 75-3 at 21-22).

On September 8 and 9, 2011, Mr. Hoff and other Jacobs employees attended a project review meeting with NAVFAC-Marianas representatives in Guam.  Def.'s App. Ex. 9 (ECF No. 75-10).  At the meeting, NAVFAC stated that Fleming would be the sole-source manufacturer of the hangar doors, and requested that Fleming prepare a Rough Order of Magnitude ("ROM") to estimate the cost of the sole-sourced item.  Hoff Dep. at 71-73, 113-14; Surles Dep. Ex. 37.

On September 12, 2011, Mr. Surles informed Mr. Kohn by email that "[t]he team just returned from the 60% review meeting.  NAVFAC has agreed to the sole sourcing as they understand that the hangar doors are a unique design.  They will require a Rough Order of Magnitude from you to review.  Please send this to Cody Hoff and he will forward to [NAVFAC]."  Email dated 9/12/11, Pl.'s App. Ex. B (ECF No. 87-2 at 3).  Mr. Kohn replied, "[t]hat is good news."  Kohn Dep. at 46, & Ex. C to Kohn Dep., Def.'s App. Ex. 5 (ECF-75-6).  Mr. Kohn testified he understood that "the government moves very slowly through things, and until the paperwork is generated and signed, it's not 100 percent official, but that's not verbally what I was being told."  Kohn Dep. at 44.

Fleming did not participate in any discussions between Jacobs and the Navy regarding sole sourcing the hangar doors to Fleming.  Hoff Dep. at 100.  Nor did Fleming participate in any meetings between Jacobs and the Navy.  *Id.* at 98.

On October 3, 2011, Fleming provided the ROM budget quote for the costs of fabricating the hangar doors to Jacobs for forwarding to the Navy.  Kohn Dep. at 69-70; Pl.'s App. Ex. Z (ECF No. 87-26).  That same day, Mr. Hoff forwarded the ROM budget quote to John DeVenecia and Clarence Lagutang at NAVFAC, who were Jacobs' primary points of contact on

Project 3010. Both reviewed the ROM upon receiving it. Lagutang Dep. at 32-33, Def.'s App. Ex. 4 (ECF No. 75-5); DeVenecia Dep. at 65-66, Def.'s App. Ex. 3 (ECF No. 75-4).

The ROM budget quote reflected the understanding between Jacobs and NAVFAC—which Jacobs conveyed to Fleming—that Fleming would be the sole-source supplier of the hangar doors. The ROM budget quote was on Fleming letterhead, signed by Seth Kohn, and stated that "we are pleased to offer our ROM budget quotation for furnishing . . . [a] set of blast rated hangar doors." Pl.'s App. Ex. Z.

On November 9-10, 2011, Mr. Hoff attended the 90% On Board Review ("OBR") with the Navy. He prepared the agenda for this meeting. Pl.'s App. Ex. C. Mr. Hoff admitted that, as of the date of this meeting, the Navy had yet to finalize sole sourcing the hangar doors to Fleming.[5] Hoff Dep. at 80-81. This was because the paperwork had not been signed off by the Contracting Officer. *Id.* at 82.

In December of 2011, NAVFAC requested that Jacobs and Fleming prepare a Justification and Approval ("J&A") memorandum describing the rationale for the sole-source. 12/16/11 Email from Mr. Hoff to Mr. Kohn, Ex. 19 to Kohn Dep., Def.'s App. Ex. 5. The Federal Acquisition Regulations ("FAR") require a J&A memorandum signed by NAVFAC for a sole-source designation to be effective. FAR §§ 6.303, 6.304, Def.'s App. Ex. 10 (ECF No. 75-11). Mr. Kohn testified that he only had a "vague idea" of what a sole source J&A was. Kohn

---

[5] The record contains evidence to suggest that despite Jacobs' representations to the contrary, the Navy had not agreed to sole source the hangar doors to Fleming at either the September 2011 or November 2011 review meetings. Mr. Lagutang, who was responsible for scheduling all of the design review meetings, testified that the Navy conducted four design reviews, 35%, 60%, pre-final and final. Lagutang Dep. at 30, 82, Pl.'s App. Ex. HH (ECF No. 87-34). Mr. Lagutang further testified that the Navy did not inform Jacobs at any of these meetings that it had agreed to sole source the hangar doors to Fleming Steel. *Id.* at 83. During the 60% and 90% design review meetings, the parties discussed four possible door manufacturers who could be chosen. *Id.* at 72. Mr. Lagutang informed Jacobs in 2011 that "a J&A would have to be approved before the Navy could commit to sole sourcing the hangar doors to Fleming." *Id.* at 70.

Ms. Aguon was a Navy Contract Specialist involved in the pre-award administration of Project 3010. Aguon Dep. at 7-8, Pl.'s App. Ex. BB (ECF No. 87-28) (filed under seal). Ms. Aguon testified that the Navy did not

Dep. at 51. He said he was "vaguely familiar with the FARS" and "no expert on the FARS." *Id.* at 29.

On December 16, 2011, Mr. Hoff sent an email to Mr. Kohn passing along NAVFAC's request that Fleming prepare language for the J&A for the hangar doors. Ex. 19 to Kohn Dep. In that same email, Mr. Hoff informed Mr. Kohn that Project 3010 had been postponed "until at least FY14" because of a budget issue in Congress. *Id.* When asked about Mr. Hoff's email dated December 16, 2011 stating that a J &A would be required to sole source to Fleming, Mr. Kohn testified that he construed that to mean that the Navy was "trying to finish up their paperwork." Kohn Dep. at 49-51.

On January 19, 2012, Fleming provided draft language to be included in the J & A to Mr. Hoff. Ex. 19 to Hoff Dep., Def.'s App. Ex. 1. Mr. Hoff completed the J&A memorandum, and emailed the unsigned J&A to Mr. DeVenecia, the NAVFAC design manager on Project 3010. Ex. 17 to Hoff Dep. On January 29, 2012, Mr. DeVenecia instructed Mr. Hoff to include the "hangar door sole-source" to Fleming in Project 3010's "final design submittal." Ex. 19 to Hoff Dep. (1/20/11 email from C. Hoff including "Item 87 – [Hangar] Door Sole-source – We will include with our final design submittal"; Mr. DeVenecia replies on 1/29/11, "Concur, please execute.").

Jacobs submitted the Project 3010 design package to NAVFAC on or about January 31, 2012. Hoff Dep. at 108. The design package included (1) the hangar door specifications, which identified Fleming as the sole-source supplier of the hangar doors; and (2) the J&A for signature by NAVFAC. Hoff Dep. at 106-07; Ex. 6 to Lagutang Dep., Def.'s App. Ex. 4; Def.'s App. Ex.

agree to sole source the hangar doors at the 60% design review meeting on September 8-9, 2011, or the 90% design review meeting in November 9-10, 2011. *Id.* at 36-37, 51.

11.[6] NAVFAC personnel reviewed the specifications at that time, but did not instruct Jacobs to remove Fleming's name, or object in any way to Fleming being identified as the sole-source supplier of the hangar doors. Lagutang Dep. at 38-39.

Mr. DeVenecia and Ms. Teresa Aguon were responsible for submitting the J&A to the designated higher authorities within NAVFAC for approval. Aguon Dep. at 106-07, Def.'s App. Ex. 13 (ECF No. 75-14). Ms. Aguon was approached by Navy Design Manager, John DeVenecia to discuss a potential sole source and the process of preparing a Justification and Approval. Aguon Dep. at 13. For a J&A approval, there are multiple approvers in the capital improvements and acquisition line. *Id.* at 14-15. However, a Congressional budget dispute stalled Project 3010 until at least FY2014. Hoff Dep. at 95-96; Ex. 19 to Kohn Dep. Six months later, in July of 2012, Mr. DeVenecia left NAVFAC for another position with the U.S. Government. DeVenecia Dep. at 48. The J&A remained unsigned. During the multi-year delay of Project 3010, no one at NAVFAC ever informed Jacobs that the J&A had not been signed. Hoff Dep. at 118-21.[7]

Even though Mr. Hoff felt there was an "understanding from back in September 2011" that Fleming Steel would be sole sourced the hangar doors, he "understood at the time that the J&A would have to be actually signed by the Navy." Until such time, sole sourcing to Fleming Steel was "not official." *Id.* at 117-118.

In October 2012, NAVFAC issued Jacobs/Burns & McDonnell a second task order, AJJY133027 ("Project 3027"), to provide A/E services for another Andersen Air Force Base

---

[6]     Fleming contends that during discovery, it requested but never received the 100% design package.
[7]     Mr. Hoff testified that he understood that J&A had to be publicized, but that he did not look for it because it was not his responsibility. *Id.* at 156-157 ("Q. Wouldn't that -- why didn't – why wasn't that of a concern to you, that there's no publication? A. Because I don't look for that kind -- that's not my responsibility to put that out. It's the contracting officer's . . .").

hangar, adjacent to the Project 3010 hangar. Ex. 22 to Kohn Dep. NAVFAC-Pacific, which oversees NAVFAC-Marianas, administered Project 3027. *Id.*

By email dated January 6, 2013, Mr. Hoff told Fleming that "you are the sole source for the hangar doors" on Project 3010, and that "we are fixing to start design on the second hangar of the same size and criteria[,]" referring to Project 3027. Pl.'s App. Ex. M. Jacobs contends that the Project 3027 hangar doors were to be identical to the Project 3010 hangar doors, and thus no additional design work was needed or requested from Fleming for Project 3027. Hoff Decl. ¶ 5, Def.'s App. Ex. 14 (ECF No. 75-15).

Subsequently, Mr. Hoff informed Fleming that it would be sole sourced the hangar doors for Project 3027 "down the road" because due to funding issues Project 3010 had not been awarded and the Navy did not have a proven design yet. Hoff Dep. at 125 ("Q. And that you never told Fleming or represented to Fleming that they would be sole sourced on 3027 as well? Later down the road, I did . . .").

Mr. Kohn testified that prior to October 2012 Jacobs stated that Project 3027 was "coming down the pike, and they were hoping it would be issued." Kohn Dep. at 147-148. Mr. Kohn further testified that, prior to that date, he had already provided Jacobs design services for Project 3027. *Id.* at 143-144.

Mr. Kohn testified that Mr. Surles sent him an email stating that Fleming Steel was sole sourced for both projects 3010 and 3027, Kohn Dep. at 152, however, Mr. Kohn subsequently recalled that the notification of sole source for both projects came in a telephone conversation between Kohn and Surles, not an email, Kohn Decl., ¶13, Pl.'s App. Ex. MM (ECF No. 87-39). Additionally, Mr. Kohn stated that Fleming provided design services in support of Project 3027 based on Jacobs' representation that the doors would be sole sourced to Fleming for this project

as well. *Id.* at ¶14. Mr. Kohn testified that he provided design services under Project 3027 in July 2012. Kohn Dep. at 143-144. Mr. Surles of Jacobs also testified that Fleming provided "valuable services" with respect to both Projects 3010 and 3027. Surles Dep. at 71-72.

In approximately April or May 2014, NAVFAC-Pacific opened the bidding process for construction of Project 3027 by issuing a request for proposals ("RFP") from general contractors. Hoff Dep. at 149. The Project 3027 specifications identified Fleming as the sole-source supplier of the hangar doors. *Id.* at 138-39. On May 14, 2014, Cody Hoff informed Fleming that it would be the sole source supplier of the hangar doors for the Navy Projects, stating that "my understanding is the spec for the hangar doors says the door[s] are to be provided by Fleming Steel." Pl.'s App. Ex. N.

Shortly after bidding began, NAVFAC received a Request for Information ("RFI") from a potential general contractor inquiring whether other hangar door manufacturers could be substituted for Fleming. 5/21/14 NAVFAC Email, Def.'s App. Ex. 15 (ECF No. 75-16). This question prompted NAVFAC-Pacific's contracting officer—apparently unaware that the bid documents named Fleming as the sole-source supplier of the hangar doors—to inform Jacobs that NAVFAC could not "sole-source the door manufacturer at this point" because "[s]ole source justification approvals are required prior to advertising the project." *Id.*

In early June 2014, Mr. Hoff spoke with Mr. Lagutang at NAVFAC-Marianas about the sole-source justification for Project 3010, and learned for the first time that the Project 3010 J&A had never been signed by NAVFAC. Def.'s Am. Resps. & Objs. To Pl.'s First Set of Interrogatories at p. 2, Def.'s App. Ex. 16 (ECF No. 75-17); Hoff Dep. at 119-21. The following day, on June 4, 2014, Layne Hazama of NAVFAC-Pacific directed Jacobs to remove the sole-source design elements from the Project 3027 specifications. Def.'s App. Ex. 17. Later that

same day, Mr. Hoff emailed Mr. Hazama, emphasizing that "[t]he government direction, established during [Project 3010] was to sole-source the doors [to Fleming]." *Id.*

On June 9, 2014, Mr. Lagutang informed Cody Hoff, "Hot off the press . . . I guess we're going with sole source after all. Can we coordinate this effort along with the AMU Tanker." Mr. Lagutang testified that this meant he got the J&A verbiage from NAVAC Pacific, not that the J&A had been completed. *Id.* at 56-57. Mr. Lagutang further testified that as of 6/9/14, sole sourcing the hangar doors to Fleming was not a done deal, and additional steps still needed to be taken on the technical side, and then the J&A had to go through the Navy's acquisition for final approval before it could go up the chain. *Id.* at 79-81.

Mr. Hoff continued to press NAVFAC for the Fleming sole-source. 6/10/14 Email from Hoff to Hazama, Def.'s App. Ex. 17. On June 20, 2014, one of Fleming's competitors, Industrial Door, sent a letter to NAVFAC protesting Fleming's designation as the sole-source supplier of the hangar doors in the Project 3027 bid documents. Ex. 9 to Horikawa Dep., Def.'s App. Ex. 18 (ECF No. 75-19). Mr. Kohn suspected that Industrial Door was interfering with Fleming's sole-source by challenging it with the Navy. Kohn Dep. at 97. On July 2, 2014, NAVFAC announced that the identification of Fleming in the RFP materials was an "error" and that Fleming's name would be removed. Def.'s App. Ex. 19 (ECF No. 75-20).

On September 17, 2014, NAVFAC announced to potential bidders that, due to Fleming's participation in the design of the hangar doors, "an apparent Organizational Conflict of Interest exists that would likely preclude Fleming's participation in this effort as either a prime or subcontractor." Ex. 17 to Horikawa Dep., Def.'s App. Ex. 18. NAVFAC advised in Notice 11, "[s]hould any [general] contractor wish to submit a proposal utilizing Fleming," it must "address the apparent OCI in [its] proposal, and provide a detailed explanation with supporting

documentation." *Id*. No general contractors submitted proposals utilizing Fleming. Horikawa Dep. at 50, 58-60. Ultimately, the successful general contractor selected Norco Manufacturing as its subcontractor to design and manufacture the hangar doors for both Guam hangar projects. 5/29/15 Email from P. McQuiston to J. Rosario at NAVFAC, Def.'s App. Ex. 20 ([ECF No. 75-21](#)).

After failing to receive a subcontract for the hangar doors, in May of 2015, Fleming retained a Washington lobbying firm—O'Brien, Gentry, & Scott (OGS)—to represent it in connection with the hangar door projects. Gentry Dep. at 11-12, Def.'s App. Ex. 21 ([ECF No. 75-22](#)). For well over a year, OGS corresponded both with the Navy and with Fleming's Congressional representatives requesting, among other things, that the Navy compensate Fleming for its design work on the hangar doors. Kostro Dep. at 9; emails between S. Kostro and C. Bidwell with NAVFAC, Ex. 11 to Kostro Dep. at 5, Def.'s App. Ex. 22 ([ECF No. 75-23](#)). In January of 2016, the Navy denied Fleming's request for financial compensation. Ex. 11 to Kostro Dep. at 5.

Subsequently, in June of 2016, Fleming commenced this action against Jacobs. Discovery has ended, and Jacobs has moved for summary judgment on all remaining claims. As the motion has been fully briefed, it is ripe for disposition.

## IV. DISCUSSION

### A. *Breach of Contract Claim (Count I)*

Jacobs maintains that Fleming's breach of contract claim fails as a matter of law for four independent reasons. First, Jacobs argues that the record is devoid of any evidence of a purported oral contract between Fleming and Jacobs. Second, even if some oral contract existed, it was too indefinite to be enforceable. Third, the doctrine of judicial estoppel bars Fleming's

breach of contract claim because it failed to disclose any such contract in its Chapter 11 Disclosure Statement filed with the U.S. Bankruptcy Court for the Western District of Pennsylvania. Fourth, the Jacobs' employees with whom Fleming contends agreed to the oral contract lacked the actual or apparent authority to do so. In addition, Jacobs submits that Fleming's breach of contract claim fails as to Project 3027 because that project did not exist at the time the alleged oral contract was formed. The Court will consider each of these arguments below.

          1.      <u>Evidence of an Oral Contract</u>

Jacobs argues that the record is devoid of any documentary evidence that an oral contract existed between Fleming and Jacobs. Jacobs submits that none of the thousands of emails or telephone conference memos produced during discovery mention any contract between Jacobs and Fleming. In addition, Jacobs contends that there are no memoranda memorializing the telephone conversation during which Fleming alleges the oral contract was formed, even though Fleming's regular practice is to memorialize important phone calls. Moreover, Jacobs submits that Fleming's own executives—Mr. Rapp and Mr. Gavroy—were unaware of any purported oral contract between Fleming and Jacobs. Finally, Jacobs argues that Fleming failed to inform any third party that it had a "multi-million-dollar" oral contract with Jacobs. Jacobs attempts to discredit Mr. Kohn's deposition testimony, which Jacobs contends is the only possible evidence of an oral agreement, as self-serving, vague and conclusory.

In response, Fleming submits that sufficient evidence exists to allow a jury to decide whether the parties entered into an oral agreement. In support, Fleming points to the Court's previous finding, in its Report and Recommendation on Jacobs' motion to dismiss, that Exhibits 3 through 10 attached to the Amended Complaint provide sufficient factual matter to show the

existence of the essential elements of a contract. That, combined with the facts gathered through discovery, demonstrate, according to Fleming, the existence of an oral agreement between it and Jacobs. After reviewing the extensive summary judgment record, the Court agrees with Fleming.

In order to state a claim for breach of contract under Pennsylvania law, Plaintiff must show "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015) (quoting *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)). The essential elements of a contract will be found to exist where (1) "both parties have manifested an intent to be bound by the terms of the agreement," (2) "the terms are sufficiently definite," and (3) there is consideration. *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct. 1995). The agreement shall be considered valid and binding if all three elements exist. *Id.* (citation omitted). Moreover, "in the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact." *Id.* (citing *Solomon v. Luria*, 246 A.2d 435 (Pa. Super. Ct. 1968)).

With regard to government procurement contracts in particular, the Court of Appeals has delineated the following standard/guidelines:

> In the attempt to ascertain the outward manifestation of intention expressed by the parties, it is often helpful to consider the general usage or custom prevailing in a given market. *See* 5 Samuel Williston, supra, § 648, at 1–2 nn. 1–2. We therefore consider "teaming agreements," as that term is normally understood within the context of government contracting. Typically, a teaming agreement is an arrangement whereby a subcontractor will "team" with a company intending to bid on a government contract as a prime contractor in order to pool financial and technical resources. *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1037 n. 1 (9th Cir.1983); *Experimental Eng'g v. United Tech. Corp.*, 614 F.2d 1244, 1245 (9th Cir.1980); *Air Tech. v. General*

*Elec. Co.*, 347 Mass. 613, 199 N.E.2d 538, 547 (1964); *see also Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 854 (11th Cir.1998). The subcontractor would ordinarily provide technical expertise and assist in the prime contractor's bid submission in return for the prime contractor's promise to award the subcontract. Parties to such a teaming agreement benefit from the arrangement not only as a means of sharing resources, but also as a hedge against the many uncertainties involved in government contracting. In many cases, the finalized subcontract between the parties to a teaming agreement will specifically enumerate the scope of obligations for each party contingent upon the prime contractor winning the RFP so that there is usually little need to enforce the teaming arrangement itself. Often, however, the parties may reach an understanding to team, but fail to execute a subcontract as anticipated in the teaming agreement. *See McDonnell Douglas*, 705 F.2d at 1037; *Experimental Eng'g*, 614 F.2d at 1245; *Air Tech.*, 199 N.E.2d at 548. As with most other "preliminary agreements" precedent to an executed contract, *see generally* E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L.Rev. 217 (1987), the question arises whether the teaming agreement itself, absent an executed subcontract, may constitute the basis for contractual liability. Courts have generally allowed such a cause of action in contract based solely on the teaming agreement, *see* Brent E. Newton, *Note, The Legal Effect of Government Contracting Teaming Agreements: A Proposal for Determining Liability and Assessing Damages in Event of Breach*, 91 Colum. L.Rev.1990, 2010–13 (1991) (collecting cases), but not without overcoming two major obstacles: (1) the intent of the parties to enter into a binding contractual relationship; and (2) the existence of sufficiently objective criteria to enforce. *See, e.g., Allen & Co. v. Occidental Petroleum Corp.*, 382 F.Supp. 1052, 1057 (S.D.N.Y.1974), *aff'd*, 519 F.2d 788 (2d Cir.1975).

These two factors for consideration closely track the general elements of contract formation. For instance, it is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce. *See Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455, 458 (1968); *Reich v. Vegex, Inc.*, 51 F.Supp. 99, 103 (E.D.Pa.1942) (applying Pennsylvania law); 1 Joseph M. Perillo, *Corbin on Contracts* § 2.8(a), at 131–34 (Rev. ed.1993). Conversely, it is equally well established in contract law that an agreement with open terms may nevertheless constitute an

enforceable contract. *See Carlos R. Leffler, Inc. v. Hutter*, 696 A.2d 157, 163 (Pa.Super.Ct.1997); 1 Joseph M. Perillo, *supra*, § 2.8, at 138–39; *cf*. Uniform Commercial Code § 2–311(1) ("An agreement for sale which is otherwise sufficiently definite ... to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one the parties."). With teaming agreements, courts are particularly sensitive to what the parties intended in agreeing to "team"—that is, searching for sufficiently definite terms for enforcement other than the simple promise to enter into a subcontract at a later date—and whether that teaming agreement was intended to bind the parties during the various stages of government contract procurement. *See, e.g., Occidental Petroleum*, 382 F.Supp. at 1057; *Air Tech.*, 199 N.E.2d at 547–48.

The fact that the parties never finalized an implementing subcontract is usually not fatal to enforcing the teaming agreement on its own—if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process. *See, e.g., Air Technology Corp.*, 199 N.E.2d at 547–48; *Experimental Eng'g*, 614 F.2d at 1246–47; *but see W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512 (Va.1997) (teaming agreement standing alone did not create any binding obligations). Such terms might include the subcontractor's assistance in the prime contractor's proposal in return for the prime contractor's delivery of an agreeable subcontract. *See Experimental Eng'g*, 614 F.2d at 1246. Or, the parties might promise to work exclusively with each other in preparing the bid for the government contract. *See McDonnell Douglas*, 705 F.2d at 1038–38. Of course, if the parties to a teaming agreement do not wish to create binding obligations before executing an ultimate subcontract, they need only say so. *See* 1 Joseph M. Perillo, *supra*, § 2.9.

*ATACS Corp. v. Trans World Comm'ns, Inc.*, 155 F.3d 659, 666-67 (3d Cir. 1998). The court of appeals observed that Pennsylvania had not explicitly recognized the validity of teaming agreements as enforceable contracts, but concluded that Pennsylvania "would recognize a teaming agreement as an enforceable contract provided that the parties intended to be bound by the teaming arrangement and the agreement contains sufficient terms for enforcement." *Id.* at 667.

With these precepts in mind, the Court will consider whether sufficient evidence exists from which a reasonable jury could find that an oral teaming agreement existed between Fleming and Jacobs.

2.    Manifestation of an Intent to be Bound by the Oral Agreement

Although Jacobs is correct that the record does not contain any documentary evidence in which the parties specifically used the term "contract" or "agreement" with regard to their teaming arrangement on the hangar doors, that is not dispositive of whether an oral contract was formed between them.    Rather, the record does contain several emails, a telephone conference memo and deposition testimony from which a reasonable jury could infer that the parties intended to enter into a teaming agreement.

For example, the record contains a Fleming telephone memo regarding Mr. Kohn's telephone call with Mr. Surles and Mr. Hoff, Jacobs' employees, on May 24, 2011. *See* Def.'s App. Ex. J to Kohn Dep. (ECF No. 75-6 at 56).  In that telephone memo, Mr. Kohn writes that he informed Surles and Hoff that after reviewing the materials that Jacobs had provided to Fleming, Fleming determined that the initial concept Jacobs presented would not work, and as a result, the engineering assistance Jacobs was requesting was extensive and would require more work than Fleming could afford to do for free.  Mr. Kohn further noted that Surles and Hoff understood but were very concerned about doing this as a "D-B"—a design-build—and the project was further complicated because of classified design criteria.  Mr. Kohn goes on to note that:

> Told them [Fleming] was not interested in just being the design engineer—we're a manufacturer.  Said that because this door sys was so unique the Govt. should lean toward sole source—Cody and Chris agreed.  Told them that Fleming would continue and complete the design work as a team member if we were sole sourced to provide the doors.  Cody agreed and would talk with Govt.  Felt sure he could get it done.  We'll await word.

*Id.*  At his deposition, Mr. Kohn recalled a telephone conference that occurred sometime within a couple of weeks of the May 24, 2011 telephone conference, during which Jacobs promised that Fleming would be sole-sourced for Project 3010.  Kohn Dep. at 116.  In relevant part, Mr. Kohn testified:

> Q:  [I]s it your testimony that there was a particular call that you had with Jacobs personnel in which a contract was reached?
>
> A:  I don't know if you can call it a contract, per se, in the fact that we've had many calls.  Any when they finally came back said, we'll get you sole sourced, we need this design, and I agreed to go ahead and finish the design work.  And that was the only reason I pursued it, was because I was told, we will get you the sole sourcing.
>
> . . .
>
> Q:  And what precise words do you remember the Jacobs personnel, people, using in terms of indicating to you that Fleming would be sole sourced?
>
> A:  To the best of my recollection it was, "we will get you sole sourced."
>
> Q:  And you understood that to mean that Jacobs was telling you that they would get NAVFAC to sole source Fleming Steel for the projects (sic)?
>
> A:  They would get it done, yes.
>
> . . .
>
> Q:  Tell me everything you remember about that phone call.
>
> A:  I just did.  They called, they wanted to know if we were proceeding.  I said, no, I cannot proceed any further.  I've got to have some assurances.  We'll get you the sole source, period.  And I said, okay, fine, I'll commit my resources to it.
>
> . . .
>
> Q:  Now, based on the documents produced in discovery by both sides, I don't see any e-mail confirming any contract between Fleming Steel and Jacobs.  Have you seen one?
>
> A:  No.
>
> Q:  Okay.  Is that consistent with your recollection that you didn't send any kind of confirmatory e-mail to Jacobs about this phone call?

<blockquote>
A:  No. Our actions were confirmatory as far as I was concerned. We proceeded and they accepted.
</blockquote>

Kohn Dep. at 116-118.[8]

On July 22, 2011, Mr. Hoff emailed Jim Brokaw of ARA stating, "Fleming has reached the end of the financial donation to the project.  They asked if we could discuss a sole source to them from the government due to this being the first door of this kind and the sensitive nature of the load data.  Jacobs supports this stand, unless you feel we can write a performance spec based on eh (sic) current concept that can be competitively bid, which would have to include the load data."  Hoff email dated 7/22/11, Pl.'s App. Ex. K (ECF No. 87-11).  Thereafter, as promised, Mr. Hoff contacted Mr. Lagutang at NAVFAC on 7/25/11 via email to request a sole source justification for the hangar doors.  *See* Hoff email dated 7/25/11, Def.'s App. Ex. 8 (ECF No. 75-9).

In addition, several emails were exchanged between Mr. Surles or Mr. Hoff and Mr. Kohn regarding the status of getting Fleming sole-sourced on the hangar doors.  In the July 29, 2011 email from Mr. Surles to Mr. Kohn, Mr. Surles states:  "Per our recent conversation, Cody [Hoff] has discussed with [NAVFAC] the possibility of using Fleming as a sole source for the Hangar Doors.  [NAVFAC] is in favor of providing this due to the uniqueness of the design, the confidentiality of the blast criteria, and the required finished product compared to competitively bidding the doors.  [NAVFAC] is in the process of running this through contracting, so hopefully they can get it approved."  Pl.'s App. Ex. F (ECF No. 87-6).  Mr. Rapp, Vice President of Operations for Fleming, testified that this email was consistent with his recollection that the

---

[8]       Jacobs focuses on Mr. Kohn's testimony—that he doesn't "know if you can call it a contract, per se"—to argue that even Mr. Kohn admits that there was no agreement.  The Court disagrees with Jacobs' conclusion, as Mr. Kohn is not an attorney, and as such, was likely not familiar with the required elements of a contract.  Conveniently, Jacobs ignores the rest of Mr. Kohn's testimony at 116-118, from which a reasonable jury could infer that there was

Navy had not yet approved Fleming to be sole sourced as of July 29, 2011, but was leaning heavily in that direction. Rapp Dep. at 17-18, Def.'s App. Ex. 23.

In addition, in the September 12, 2011 email from Surles to Kohn, Mr. Surles states: "NAVFAC has agreed to the sole sourcing . . .." Pl.'s App. Ex. B. Mr. Rapp testified that when he read that email, his understanding was that the "U.S. Navy had agreed to the sole sourcing and were looking for a rough order of magnitude." Rapp Dep. at 16.

Jacobs attempts to argue that Mr. Gavroy, Flemings' principal engineer on the hangar doors project, testified that as of 2011 a contract did not exist between Jacobs and Fleming, citing Gavroy Dep. at 50: 20-22. However, Mr. Gavroy's actual testimony does not support Jacobs' argument. When the entire testimony is reviewed, it is clear that Mr. Gavroy is referring to the subcontract with the Government for the manufacturing of the hangar doors:

> Q: And what is your understanding as to why Al Sullivan is suggesting, "If we could get the Contractor/Navy to buy off, could we work the contract that we go ahead and design the door and fabricate it early"?
>
> A: I think at this point in time, engineering wasn't very busy, so Al is saying, well, if we're going to actually produce this door, why don't we start working on it now. And I think that was no, we're not going to do that until we get a contract, which is usually the way it goes.
>
> Q: So you did not have a contract at this point?
>
> A: No. And this would have been on the full-scale door, not the mock up.

Gavroy Dep. at 50. Moreover, the evidence suggests that neither Mr. Gavroy nor Mr. Rapp would have any knowledge of whether an oral teaming agreement existed between Fleming and Jacobs, since Mr. Kohn was exclusively responsible for contract negotiations with Jacobs. Kohn

---

an offer and acceptance.

Decl. ¶ 9. With regard to his understanding of how Fleming would be compensated for its work on the hangar door design and specifications in 2011, Mr. Gavroy testified that he was under the impression that Fleming was sole-sourced and they were going to be doing all the work and providing the doors. Gavroy Dep. at 70.

Moreover, the emails and deposition testimony of Jacobs' own employees—Messrs. Klein, Hoff, and Surles—provide evidence from which a reasonable jury could infer that an oral teaming agreement existed between Fleming and Jacobs. *See, e.g.,* Klein email dated 5/6/11 to Jim Brokaw with ARA, Pl.'s App. Ex. J (indicating Klein is "in pursuit with Fleming to develop OPTION 2"); Klein email dated 5/9/11, Pl.'s Ex. J (requesting Fleming's assistance in developing Option 2); Hoff Dep. at 40, Pl.'s App. Ex. FF (Jacobs was searching for "the best design solution for our clients as possible . . . [and was] turning to Fleming because of Fleming's particular expertise in development of hangar doors."); Surles email dated 5/20/11, Pl.'s App. Ex. G (attaching details on the hangar door and thanking Fleming for "working with us to develop a solution."); Gavroy Dep. at 31-35 & various emails between Gavroy & Surles, Exs. 6-9 to Gavroy Dep., Def.'s App. Ex. 7 (Jacobs and Fleming collaborated to develop hanger door concept designs, including designs for the hangar door head, during May, June and July 2011); Hoff Dep. at 69-70 (Hoff supported sole-sourcing to Fleming; it was a means for compensating Fleming for its continued design work on the hangar doors); Hoff's Meeting Notes, Pl.'s App. Ex. S (ECF No. 87-19) (noting no permission to use proprietary details in RFP without sole-source). In addition, the fact that Hoff continued to press the NAVFAC to approve sole-sourcing to Fleming, even as late as 2014, raises the inference that Jacobs knew it would be in breach of its teaming agreement to get Fleming sole-sourced if NAVFC did not approve the sole-sourcing.

In *ATACS Corp.*, the Court of Appeals found that the parties had entered into an oral teaming agreement, based on various letters exchanged between the parties indicating their intent to team and work exclusively with each other in preparation for the RFP. 155 F.3d at 668. The evidence also showed that the prime contractor represented to the government that the plaintiffs constituted part of the "team" that would undertake the project under its auspices as prime contractor. *Id.* As such, the Court of Appeals concluded that the plaintiffs met their burden of establishing an intent to be bound by the terms of the teaming agreement during the negotiations for a subcontract to be executed by the parties. *Id.* Similarly here, a reasonable jury could conclude from the parties' discussions and emails, and Jacobs' representations to NAVFAC, that Jacobs needed Fleming's expertise to come up with the design and specifications for the hangar doors and Fleming agreed to help in exchange for Jacobs agreeing to sole source the manufacturing of the hangar doors to Fleming and obtaining NAFVAC's approval of Fleming as the sole source for the hangar doors. As such, a reasonable jury could find that they manifested their mutual assent to be bound by their oral teaming agreement.

The existence of a teaming agreement between Fleming and Jacobs is also supported by the Massachusetts Supreme Judicial Court's decision in *Air Technology Corp. v. General Electric Co.*, 199 N.E. 2d 538 (Mass. 1964), cited by the Third Circuit in *ATACS Corp.*, *supra*. In *Air Technology*, the defendant sought plaintiff's research and design assistance in obtaining and carrying out a prime contract for a largely unspecified, untested nuclear detection system, in exchange for defendant obtaining Air Force approval of plaintiff as a sole source for the nuclear detection system. 199 N.E. 2d at 619, 624. Although defendant included plaintiff in the formal proposal to the Air Force, it made no effort after that to obtain Air Force approval of plaintiff as the sole source. *Id.* at 623. The court found that both defendant and plaintiff had made

substantial contributions to the team in time and expenditure, and risked the value of their preliminary work. *Id.* at 625. Even though their relationship was not a joint venture, the Court held that the defendant may be held to its contractual responsibilities to plaintiff as a team member. As such, by failing to press for plaintiff's continued participation in the program and offering the work for competitive bid, the Court concluded that defendant had breached its duties to plaintiff. *Id.* at 626.

Despite the evidence cited above suggesting the existence of a teaming agreement, Jacobs argues that after Fleming learned in 2014 that it would not be sole-sourced for the Projects, Fleming never invoiced Jacobs for amounts supposedly due under the alleged oral contract, and that somehow demonstrates that an oral agreement did not exist between them. While it is undisputed that Fleming initially pursued compensation from the Navy over its loss of the sole-sourcing on the hangar doors, when it was unsuccessful, Fleming then sought compensation from Jacobs. Fleming's choice to seek compensation from the Navy first was a legal strategy and does not alone automatically lead to the conclusion that it did not believe it had any legal recourse against Jacobs.

Jacobs also proffers Mr. Kohn's failure to mention the oral contract between Fleming and Jacobs to third parties, such as Stephanie Kostro of OGS (Washington lobbying firm hired by Fleming), as evidence that the oral agreement did not exist.[9] This may be a factor that the jury deems relevant, but there is also evidence contained in the record to suggest otherwise. For example, the following evidence suggests that Ms. Kostro was aware of the teaming arrangement between Fleming and Jacobs. First, the letter from Cindy Readal, with the Department of the

---

[9] Jacobs also includes in this category Fleming's failure to list the alleged oral contract on its Disclosure form in the Bankruptcy case. This issue is addressed below.

Navy, to Congressman Mike Kelly dated September 2, 2016 refers to Ms. Kostro's previous discussions with the Navy regarding the sole-sourcing issue and the use of information provided by the Navy in Fleming's future negotiations with Jacobs to resolve their dispute. Readal Letter dated 9/2/16, Pl.'s App. Ex. E (ECF No. 87-5). Second, a series of emails exchanged between Ms. Kostro and various Navy personnel indicates that she was actively negotiating with them as early as June 24, 2015 on Fleming's behalf. *See* Pl.'s App. Ex. H (ECF No. 87-8). In addition, James Gentry, a partner in OCG who supervised Ms. Kostro, testified that at Mr. Kohn's request, he reviewed all of the documents to obtain an understanding of what Fleming's interaction with the Navy and Fleming's interaction with Jacobs was, in order to determine how Fleming may seek some resolution of the situation. Gentry Dep. at 12, Def.'s App. Ex. 21 (ECF No. 75-22 at 13).

In addition to Kostro and Gentry, the evidence shows that Fleming informed two other third parties—Senator Toomey and Congressman Kelly—that it was engaged by Jacobs and the Navy to assist in developing the design for the large Blast Hangar Doors in return for Fleming being designated as the sole source. *See* Fleming's Correspondence to Sen. Toomey dated 6/8/14, Ex. H attached to Kohn's Dep., Def.'s App. Ex. 5 (ECF No. 75-6 at 50-55); Readal's Letter, Pl.'s App. Ex. E. *See also* Capital Improvements – Information Paper dated 7/17/14, Pl.'s App. Ex. P (ECF No. 87-16). Thus, given this contradictory evidence, the question of whether Mr. Kohn informed third parties of the existence of the alleged oral contract is best resolved by the jury.

Finally, Jacobs' assertion that Kohn's deposition testimony, which is the only possible evidence of an oral agreement, is self-serving, vague and conclusory, and is belied by the evidence cited above.

Viewing the entire record and giving Fleming the benefit of all favorable inferences, the Court finds that a reasonable jury could find a teaming agreement was formed between Fleming and Jacobs.

3.    Whether the Oral Contract is Too Indefinite to be Enforced

Jacobs next argues that if an oral agreement was formed, which it disputes, its terms were too indefinite to be enforceable.    According to Jacobs, the only evidentiary support for the alleged oral contract is Mr. Kohn's deposition testimony, which falls short of establishing an enforceable contract.  Jacobs contends that Mr. Kohn's description of the alleged contract is so vague that its most basic terms are left to speculation.

Fleming counters that the terms of their oral agreement are not vague, but are readily determinable from the contemporaneous evidence.   In support of its argument, Fleming points to evidence in the record, *e.g.*, the 5/9/11 Klein email (Pl.'s App. Ex. J), Hoff Dep. at 68-72, and the Kohn Dep. at 115-117, that shows the scope of the work to be performed—Fleming would provide to Jacobs design plans and specifications for the hangar doors that complied with the blast-rated requirements in the Navy Delivery Order—and the consideration—Jacobs promised to obtain a sole-source designation for Fleming from the Navy.

After reviewing the record evidence, the Court finds that the terms of the teaming agreement are sufficiently definite to be enforceable.   In determining whether an agreement contains sufficiently definite terms, Pennsylvania has adopted the RESTATEMENT (SECOND) OF CONTRACTS § 33 (1981).  *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 487 (E.D.Pa. 2018) (citing *Reed v. Pittsburgh Bd. of Pub. Educ.*, 862 A.2d 131, 135 (Pa. Commw. Ct. 2004)).   The Restatement provides:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

RESTATEMENT (SECOND) OF CONTRACTS § 33 (1981). "[T]he omission of an essential term in a contract, such as price, does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." *ATACS Corp.*, 155 F.3d at 667 (citations omitted). "However, '[w]here . . . there is no agreement or even a discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to reasonably believe that it could be enforceable in an action at law.'" *Ecore Int'l*, 343 F. Supp. 3d at 489 (quoting *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. Ct. 2006)) (italics in original).

Here, as described in detail in Section 1.a. above, the record evidence suggests that the terms of the teaming agreement provide an adequate basis for determining whether a breach has occurred and an appropriate remedy. From this evidence and other evidence in the record, a reasonable jury could find that as a result of Jacobs' failure to get Fleming sole sourced on the hangar doors, Fleming was deprived of a valuable business opportunity for the manufacture of the hangar doors. Thus, the terms of the teaming agreement are sufficiently definite for enforcement and provide a basis for fashioning a suitable remedy.

4.     Judicial Estoppel Doctrine

Jacobs argues that the doctrine of judicial estoppel provides another basis for finding that Fleming's breach of contract claim fails as a matter of law. Specifically, Jacobs argues that Fleming is judicially estopped from asserting the existence of an oral contract in this case because it failed to disclose any such contract in its November 2011 Disclosure Statement filed with the U.S. Bankruptcy Court. Jacobs submits that the Disclosure Statement required Fleming to list all leases and executory contracts to which Fleming was a party as of that date— November 14, 2011. By failing to do so, Fleming has taken irreconcilably inconsistent positions with its breach of contract claim in this case.

In response, Fleming counters that Jacobs grossly misunderstands bankruptcy law, as only ongoing contracts existing at the time the bankruptcy petition was filed had to be disclosed. Since the oral agreement between Fleming and Jacobs did not exist on April 4, 2011 when the bankruptcy petition was filed, Fleming submits that it was not required to list its oral contract with Jacobs in any of its bankruptcy filings.

Judicial estoppel was first articulated by the Court of Appeals in *Scarano v. Central Railway Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953), in which the court stated that "'a plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention.'" *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003). Since its decision in *Scarano*, the Court of Appeals has consistently opined that judicial estoppel should only be applied to avoid a miscarriage of justice. *Id.* (citations omitted). The Court of Appeals identified three criteria for determining whether judicial estoppel should be applied:

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position "*in bad faith* -i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

*Id.* at 319-20 (quoting *Montrose Med. Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 1996) (emphasis added in original).

The Court finds no merit to Jacobs' argument that Fleming was required to list the oral agreement on its Disclosure Statement because the oral contract was "presently known" to Fleming at that time. Jacobs cites several non-precedential cases for the proposition that a debtor in bankruptcy has duty to disclose all assets and interests in property, and this duty continues throughout the case, thus requiring the debtor to amend its forms and schedules whenever necessary to insure the accuracy and reliability of the information disclosed.[10] These cases are inapposite, however, to the instant matter, because the debtors omitted or failed to adequately disclose assets or claims that <u>existed</u> at the time the bankruptcy case was initiated. In the instant matter, the oral contract did not exist on the date Fleming filed its bankruptcy petition on April 4, 2011. Moreover, none of the cases cited by Jacobs held that a debtor is required to list assets or claims on its disclosure statement that were acquired *after* the bankruptcy petition is filed. Nor would the Court expect such a holding, as it is axiomatic that the property of the bankruptcy estate is determined as of the date the petition is filed, with certain exceptions not applicable here. 11 U.S.C. § 541; *see also In re Retort*, 300 Bankr. R. 411, 414 (W.D. Pa. 2003) ("The date upon which the petition is filed is a most crucial date as it determines which

---

[10]     In addition to *Krystal Cadillac-Oldsmobile*, Jacobs cited *Hardee-Guerra v. Shire Pharmaceuticals,* 737 F. Supp. 2d 318, 331-32 (E.D.Pa. 2010), and *Castillo v. Coca-Cola Bottling Co. of Eastern Great Lakes,* Civ. A. No.

assets become a part of the bankruptcy estate pursuant to § 541(a), which debts will be discharged pursuant to § 727(b), and which creditors, if any, will be paid pursuant to § 726.").

Since Fleming was not required to list its oral teaming agreement on its Disclosure Statement in the bankruptcy proceedings, Jacobs cannot establish the first element of judicial estoppel—that Fleming has taken two positions that are irreconcilably inconsistent. Accordingly, the Court finds that the doctrine of judicial estoppel does not bar Fleming's breach of contract claim.

### 5. Actual/Apparent Authority of Jacobs' Employees

Jacobs submits that another independent basis exists for granting summary judgment in its favor on Fleming's breach of contract claim—neither Cody Hoff nor Chris Surles possessed actual or apparent authority to bind Jacobs to the oral contract alleged by Fleming. In support of this argument, Jacobs argues that the record is devoid of any evidence to establish that Mr. Hoff or Mr. Surles possessed either actual or apparent authority. Before addressing the merits of Jacobs' argument, the Court must consider whether, as Fleming contends, Jacobs has waived this argument.

Fleming submits that Jacobs has waived this argument because it is an affirmative defense that was not raised in either its Answer (ECF No. 35) or Amended Answer (ECF No. 51) to Plaintiff's Second Amended Complaint (ECF No. 34). Had Jacobs asserted this affirmative defense, Fleming argues that it would have focused on this issue during discovery, and it has now lost the opportunity to do so.

Federal Rule of Civil Procedure 8(c) requires a party who is responding to a pleading to "affirmatively state any avoidance or affirmative defense," and provides a non-exhaustive list of affirmative defenses that must be pled. *See Jones v. Bock*, 549 U.S. 199, 212 (2007) ("Rule 8(c)

identifies a nonexhaustive list of affirmative defenses that must be pleaded in response" to a complaint.) "The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed." *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)) (other citations omitted); *Sterten v. Option One Mortg. Corp.*, 546 F.3d 278, 283 (3d Cir. 2008) (citing *Robinson*, 313 F.3d at 134-35; *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) ("Central to requiring the pleading of affirmative defenses is the prevention of unfair surprise. A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.")).

Jacobs' defense that its employees—Hoff and Surles—lacked actual or apparent authority to bind Jacobs to an oral contract with Fleming, is not one of the affirmative defenses specifically enumerated in Rule 8(c). Nonetheless, the residuary clause of Rule 8(c)—"any other matter constituting an avoidance or affirmative defense"—has provided the courts with authority for finding a substantial number of additional defenses that must be timely and affirmatively pled. *Ingraham*, 808 F.2d at 1078 (citing 5 C. Wright & A. Miller, FED. PRAC. & PROC. CIV. § 1271 (1969 & supp.); 27 FED. PROC., L.Ed. § 62.63 (1984 & supp.)). Applying the guidance of the Court of Appeals in *Sterten* to the present facts, the proper inquiry is whether, given what Fleming is already required to show in support of its breach of contract claim, Jacobs' failure to raise the actual/apparent authority issue specifically deprived Fleming of an opportunity to rebut that defense or to alter its litigation strategy accordingly. *Sterten*, 546 F.3d at 285. The Court finds that the issue of whether Jacobs' employees were vested with actual or

apparent authority to bind it to the alleged oral contract is properly categorized as an affirmative defense.

The Court's conclusion is buttressed by the fact that a number of authorities have held that an agent's authority to bind its principal is an affirmative defense that must be pleaded. *See* 5 C. Wright & A. Miller, FED. PRAC. & PROC.: CIV. 3d § 1271 at 587 (2004 & 2018 supp.) (apparent authority) (citing *Callaway v. Hamilton Nat'l Bank,* 195 F.2d 556, 562-63 (D.C. Cir. 1952) (stating that the defendant had the burden to plead and prove elements of apparent authority)); *see also In re Montgomery Ward & Co., Inc.,* 428 F.2d 154, 158 n. 8 (3d Cir. 2005) (noting that one of the affirmative defenses raised to the enforceability of the agreement included the lack of actual or apparent authority of the officer who signed it); *Branding Iron Club v. Riggs,* 207 F.2d 720, 725 (10th Cir. 1953) (defense that president lacked authority to enter into a contract with plaintiff was an affirmative defense that must be specifically pleaded); *Devine v. Hutt,* 863 A.2d 1160, 1169 (Pa. Super. Ct. 2004) ("Defenses to the statute of limitations, such as estoppel, agreement, agency, apparent authority, fraud, or concealment are waiveable defenses and must be raised in a reply to new matter asserting the statute of limitations as an affirmative defense."); *Chouteau Auto Mart, Inc. v. First Bank of Mo.,* 148 S. W. 3d 17, 25 (Mo. Ct. App. 2004) ("An affirmative defense is defined as one which 'seeks to defeat or avoid plaintiff's cause of action [and] ... avers that even if the petition is true the plaintiff cannot prevail because there are additional facts that permit the defendant to avoid legal responsibility.' Apparent authority is such a defense.") (internal & other citations omitted); *Acree v. Guar. Fed. Bank,* No. 01-99-01108-CV, 2001 WL 225688, at *5 (Tx. App. Mar. 8, 2001) ("Apparent authority is based on estoppel and is thus an affirmative defense."); *Mattson v. Commercial Credit Bus. Loans, Inc.,*

723 P.2d 996, 1004 (Or. 1986) (stating that defendants had raised the affirmative defense of apparent authority).

Neither Jacobs' Answer nor Amended Answer to the Second Amended Complaint pleads lack of actual or apparent authority as an affirmative defense. Generally, affirmative defenses are waived if they are "not specifically raised 'by responsive pleading or by appropriate motion.'" *Sterten*, 546 F.3d at 283 (quoting *Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 321 (3d Cir. 2006)); *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991). However, failure to raise an affirmative defense does not always result in waiver. *Charpentier*, 937 F.2d at 863 (citing *Prinz v. Greate Bay Casino Corp.*, 705 F.2d 692,694 (3d Cir. 1983)). For example, Courts have found an affirmative defense was not waived where the defendant sought leave to amend its answer to include the affirmative defense and such amendment was done in "sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." *Id.* at 863-64 (citations & internal quotation marks omitted); *Johnson v. Cullen*, 925 F. Supp. 244, 247 n. 2 (D. Del. 1996) (citing *Charpentier*, 937 F.2d at 864). "The reason for [Rule 8(c)] is to put plaintiff on notice, well in advance of trial, that a defendant intends to pursue a defense that is in the nature of an avoidance." *Johnson*, 925 F. Supp. at 247 n. 2 (citing *Blonder-Tongue Lab.*, 402 U.S. at 350).

In reply to Fleming's waiver argument, Jacobs submits that under Pennsylvania law, "apparent authority is not an affirmative defense, because it must be proved by 'the party asserting it[.]'" Def's Reply Br. at 6 (citing *Clark Res., Inc. v. Verizon Business Network Servs., Inc.*, Civ. A. No. 1:10-cv-1119, 2012 WL 1339697, at *7 (M.D. Pa. Apr. 18, 2012). However, *Clark Resources* does not stand for the proposition stated by Jacobs. Rather, what the Court stated was that the "burden of establishing the existence of apparent authority rests with the party

36

asserting." *Id.* Nowhere in Judge Kane's opinion does she state that apparent authority is not an affirmative defense. In fact, the defendant in *Clark Resources* pleaded the affirmative defense of lack of actual/apparent authority in its answer to the amended complaint. *See* Ans. & Affirm. Defenses to Am. Compl., Second Affirm. Def., ECF No. 39 at 7, Docket No. 1:10-cv-01119 (M.D.Pa. June 10, 2011). Thus, the issue of whether lack of actual/apparent authority is an affirmative defense that must be pleaded was never raised, argued or decided in *Clark Resources*.

Moreover, at the time the defendant filed its Answer and Affirmative Defenses in *Clark Resources*, discovery was ongoing and was extended to August 26, 2011. Thus, over two months remained for the plaintiff to conduct discovery on the actual/apparent authority issue. Although the Court in *Clark Resources* granted summary judgment for the defendant because the plaintiff failed to adduce any evidence of actual or apparent authority, the plaintiff had advanced notice of the affirmative defense and an opportunity to obtain evidence during discovery to establish such authority or at least raise questions of fact for the jury.

By contrast here, Fleming had virtually no advance notice or any opportunity to discover evidence to show actual or apparent authority. It appears that the first time Fleming's counsel became aware of Jacobs' defense of lack of actual or apparent authority was during the deposition of Jacobs' employee, Mr. Hoff, six days prior to the end of discovery.[11] Mr. Hoff testified that Jacobs has work instructions and global standard operating procedures ("GSOP") that sets forth who has what contractual signing authority for Jacobs. Hoff Dep. at 27: 14-21. At that point, Plaintiff's counsel requested a copy of the GSOP, to which defense counsel responded that it would not produce the GSOP if it was not responsive to Plaintiff's RFP's—Requests for

---

[11]     At one point during Mr. Hoff's deposition, he was questioned whether he had authority to sign contracts or amendments to contracts on Jacobs' behalf, and he denied having such authority. Hoff Dep. at 26: 22-25, Pl.'s App. Ex. FF (ECF No. 87-32).

Production of Documents.[12]  *Id.* at 27:22-25.  Because Mr. Hoff's deposition was taken six days before discovery ended, there was insufficient time to serve and answer an additional RFP, and defense counsel refused to provide the GSOP without it.  *Id.* at 27: 25 to 28: 1-7.   In addition, Fleming was precluded from conducting discovery on the issue of apparent authority, given the lack of "pragmatically sufficient" notice by Jacobs.  As such, Fleming has been prejudiced in its ability to respond to Jacobs' defense of lack of apparent authority.  Accordingly, the Court finds that Jacobs has waived its affirmative defense of actual or apparent authority.

      6.    <u>Project 3027</u>

      Finally, Jacobs argues that the breach of contract claim against it must be dismissed as to Project 3027 because that project did not exist at the time the alleged oral contract was formed, and the undisputed facts show that the alleged oral agreement plainly did not contemplate Project 3027.   In support, Jacobs points to Mr. Kohn's deposition, in which he testified that the conversations which formed the basis of the oral agreement concerned only Project 3010 (Kohn. Dep. at 116-17).  Jacobs also proffers the Navy Task Force Order for Project 3027 which was only issued on October 4, 2012  (Kohn Dep.  Ex. 22, attached to Def.'s App. Ex. 5, ECF No. 75-6 at 90-98); Mr. Hoff first learned of Project 3027 late in 2012, approximately one month prior to the issuance of the Task Order for that project (Hoff Dep. at 90); and Mr. Hoff first informed Mr. Kohn of Project 3027 via email in January 2013 (Hoff Dep. Ex. 20, attached to Def.'s App. Ex. 1, ECF No. 75-2 at 96).

      In response, Fleming counters that prior to October of 2012, Jacobs informed Fleming that Project 3027 was "coming down the pike, and they were hoping it would be issued."  Kohn

---

[12]      Fleming's RFPs at No. 18 included a request for "any and all documents that are related in any way to . . . affirmative defenses in Jacobs' Answer." Pl.'s Opp'n Br. at 14 n. 3.  Fleming maintains that had Jacobs raised lack of apparent authority as an affirmative defense in its Answer, Fleming should have received the GSOP in response to RFP No. 18.  *Id.*

Dep. at 147-48 (Pl.'s App. Ex. GG). Mr. Kohn further testified that prior to October of 2012, Fleming had already provided Jacobs design services for Project 3027, in July of 2012; even though there may not have been any drawings yet relating to Project 3027, Mr. Kohn testified that the "two jobs got muddled together in some respects". *Id.* at 143-44. Fleming also points to the deposition testimony of Mr. Surles, in which he stated that Fleming provided "valuable assistance" with respect to both Projects 3010 and 3027. (Surles Dep. at 71-72, Pl.'s App. Ex. II). Thus, Fleming argues that even though the Navy awarded Jacobs a Task Order for Project 3027 after Fleming and Jacobs reached an oral agreement, the parties understood that Fleming would be compensated by way of a sole source for assisting in Project 3027 as well.

The Court concludes that no rational jury would find that the alleged oral agreement formed with regard to Project 3010 included Project 3027. Fleming has failed to identify any relevant evidence to show that Project 3027 was discussed or contemplated during the parties' oral communications which form the basis of their alleged oral agreement.[13] As such, the Court finds that Jacobs is entitled to summary judgment on Fleming's breach of contract claim as to Project 3027.

### B.    *Negligent Misrepresentation Claim (Count II)*

Jacobs has also moved for summary judgment on Fleming's negligent misrepresentation claim.[14] In support, Jacobs argues that Fleming's negligent misrepresentation claim fails as a matter of law because (1) it is barred under Pennsylvania's economic loss doctrine; and (2)

---

[13]     Further, the Court notes that Mr. Hoff stated in his declaration that because the hangar door specifications for Project 3027 were identical to Project 3010, it was not necessary for, not did Jacobs request, Fleming to perform any work specifically for Project 3027. Hoff Decl., ¶ 5, Def.'s App. Ex. 14 (ECF No. 75-15).

[14]     In Pennsylvania, "[n]egligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (citations omitted).

Fleming's reliance on Jacobs' alleged misrepresentations was not justifiable. In the alternative, Jacobs asks the Court to grant partial summary judgment limiting Fleming's available damages.

    1.    <u>Economic Loss Doctrine</u>

In Pennsylvania, the economic loss doctrine "'provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir.2008) (quoting *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. Ct. 2003)). The doctrine "'is concerned with two main factors: foreseeability and limitation of liability.'" *Id.* (quoting *Adams*, 816 A.2d at 307). As the Pennsylvania Superior Court explained:

> To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.

*Aikens v. Baltimore & Ohio R.R. Co.*, 501 A.2d 277, 279 (Pa. Super. Ct. 1985). An exception to the economic loss doctrine's bar of negligent misrepresentation claims seeking only economic damages is set forth in Section 552(1) of the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment, *or* in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS, § 552(1). The Pennsylvania Supreme Court has adopted this exception in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, and held that it applied in:

> cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties

have no direct contractual relationship with the supplier of information. In so doing, we emphasize that we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.

866 A.2d 270, 287 (Pa. 2005).  In *Bilt-Rite*, the architect entered into a contract with the school district to provide architectural services for the design and construction of a new school.  *Id.* at 272.  The architectural services included the preparation of plans, drawings and specifications which were to be submitted to contractors for the purpose of preparing bids for the construction of the new school.  The architect's plans, drawings and specifications were included in the bid documents supplied to the contractors.  The plaintiff in *Bilt-Rite* was a contractor that relied upon the information supplied by the architect to the school district to obtain the winning bid for the construction project.  After construction commenced, the contractor discovered that the work could not be completed using normal and reasonable construction methods, but required the contractor to employ special construction methods which resulted in substantially increased construction costs.   The contractor sued the architect for negligent misrepresentation claiming that the architect's specifications were false and misleading, and sought economic damages for the increased construction costs.  *Id.* at 272-73.  The Court held that the facts of that case fell squarely within the framework of Section 552, and therefore, plaintiff's negligent misrepresentation claim against the architect was cognizable under Pennsylvania law.  *Id.* at 288.

The Court in *Bilt-Rite* further noted that the rationale for applying Section 552 to architects and other design professionals was persuasively articulated by the Court of Appeals of North Carolina in *Davidson & Jones, Inc.*, "where the court stated that such a duty to foreseeable

third parties flows from the architect's contractual duties to the party retaining the architect, an approach we embrace:"

> An architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects . . .. Where breach of such contract results in foreseeable injury, economic or otherwise, to persons so situated by their economic relations, and community of interests as to impose a duty of due care, we know of no reason why an architect cannot be held liable for such injury. Liability arises from the negligent breach of a common law duty of care flowing from the parties' working relationship. Accordingly, we hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably *resulting from breach of an architect's common law duty of due care in the performance of his contract with the owner.*

*Bilt-Rite*, 866 A.2d at 286 (quoting *Davidson & Jones, Inc. v. Cty. Of New Hanover,* 255 S.E. 2d 580, 584 (N.C. App. 1979)) (emphasis added).

Subsequently, in affirming that the economic loss doctrine barred a negligent misrepresentation claim against a utility company, the Pennsylvania Supreme Court found the *Bilt-Rite* exception inapplicable where a contractor suffered economic losses from a delay in a construction project when it struck a gas line during excavation work, as a result of the gas utility company's failure to properly mark the location of gas lines on a construction site. *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 843 (Pa. 2009). The Court reasoned that the utility company was not a "professional information provider" and not in the "business of providing information for pecuniary gain[.]" *Id.* In so holding, the Pennsylvania Supreme Court observed that the utility company was not "akin" to one who is paid for the professional service of preparing detailed information for a client's project. *See id.*

Although there have been no subsequent relevant State Supreme Court decisions, the Pennsylvania Superior Court considered the *Bilt-Rite* exception's scope in 2017, and found that it

should be read to encompass not only architect-contractors, but also accountants who are similarly "providing professional information." *Fulton Bank, N.A. v. Sandquist,* 2017 WL 4284923, at *8 (Pa. Super. Sept. 27, 2017); *id.* (citing with approval *Kirschner v. K&L Gates, LLP,* 46 A.3d 737, 741 (Pa. Super. 2012) (applying *Bilt-Rite* exception to law firm and investigating fraud company which were "professional firms in the business of supplying information"). *See also Brownsville Prop. Corp., Inc. v. Walnut Capital Real Estate Servs., Inc.*, Bankr. No. 10-21959; Adv. No. 12-2029, 2013 WL 4010308, *11 (Bankr. W.D. Pa. Aug. 1, 2013) (finding that a real estate broker who negligently supplied information to a potential buyer would fall within the scope of the *Bilt-Rite* exception, because a large part of a broker's business entails "conveying information for the guidance of others in their business transactions[,]" and "brokers have a direct pecuniary interest in doing so because by supplying such information they hope to induce a sale of the subject property and thereby obtain a sales commission."); *Azur,* 601 F.3d at 223 (finding that a cardholder did not fall within the *Bilt-Rite* exception because the credit card company was not in the business of providing the cardholder information for pecuniary gain and the cardholder's economic damages were unaccompanied by physical or property damage).

In support of its request for summary judgment on Fleming's negligent misrepresentation claim, Jacobs argues that each of the alleged misrepresentations concerned Fleming's sole-source status. As an architectural and engineering firm, Jacobs submits it is not in the business of selling advice or information about the FAR or the Navy's contracting rules and regulations. As such, Pennsylvania's economic loss doctrine bars Fleming's negligent misrepresentation claim.

In opposition, Fleming advances several arguments. First, Fleming argues that Jacobs' application of the economic loss doctrine is misplaced because it applies to product liability

cases, and the "gist-of-the-action" doctrine is a better fit for non-products liability cases. This argument can easily be overridden. As Jacobs correctly argues in reply, in addition to products liability claims, the economic loss doctrine has been applied to bar claims for negligence, fraud, and negligent misrepresentation in actions between commercial enterprises where only economic losses are asserted. *Sunburst Paper, LLC v. Keating Fibre Int'l, Inc.,* CA No. 06-3959, 2006 WL 3097771, *3 (E.D. Pa. Oct. 31, 2006) (citing *Lower Lake Dock Co. v. Messinger Bearing Corp.*, 577 A.2d 631, 634-34 (Pa. Super. Ct. 1990) (negligence and products liability claims barred); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir.2002) (fraud claim barred); *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 620 (3d Cir.1995) (negligent misrepresentation claim barred); *Factory Mkt., Inc. v. Schuller Int'l,* 987 F.Supp. 387, 397 (E.D.Pa.1997) (negligence claim barred); *Sun Co. v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365, 374 (E.D.Pa.1996) (negligence claim barred)); *see also Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co.*, 700 F. Supp. 2d 720, 733 (W.D. Pa. 2010) (negligent misrepresentation claims barred); *Axiall Corp. v. Descote S.A.S.*, No. 2:15-CV-250, 2018 WL 621287, *18 (W.D.Pa. Jan. 30, 2018) (fraudulent and negligent misrepresentation claims barred). As to the Fleming's suggestion that the "gist-of-the-action" doctrine is a better fit for non-products liability claims, that argument is nonsensical, as a defendant is not limited to asserting only one of those doctrines as an affirmative defense. *See Mill Run Assocs. v. Locke Property Co.*, 282 F. Supp. 2d 278, 291 n .4 (E.D. Pa. 2003) (noting that "both the Economic Loss Doctrine and the Gist of the Action Doctrine are applicable to tort actions that inappropriately stem from contract liability"). Moreover, the legal precedent discussed above holds that the economic loss doctrine applies to negligent misrepresentation claims.

Next, Fleming argues that because Jacobs is disputing the existence of the oral agreement, it is premature to apply the economic loss doctrine to bar its negligent misrepresentation claim at the summary judgment stage, citing in support *Covertech Fabricating, Inc. v. TVM Building Prods., Inc.*, Civ. A. No. 3:13-150, 2014 WL 2605427, at *6 n. 5 (W.D. Pa. June 11, 2014). Fleming contends it should not be denied the opportunity to seek relief under its negligent misrepresentation claim as an alternative theory of relief, should the jury find that an oral contract did not exist between Fleming and Jacobs. In reply, Jacobs submits that *Covertech Fabricating* does not support Fleming's argument, as the ruling there was on a motion to dismiss and, unlike the case at bar, the facts were not sufficiently developed for the Court to determine the contours of the parties' alleged agreement or whether they had entered into a binding agreement at all. Jacobs further maintains that it is not seeking to bar the negligent misrepresentation claim because it is duplicative of a contract claim, as the application of the economic loss doctrine does not depend on the status of the alleged oral contract. For support, Jacobs relies on *Azur v. Chase Bank, USA, N.A.*, 601 F.3d 212, 223 (3d Cir. 2010).

The Court agrees with Jacobs that the application of the economic loss doctrine to Fleming's negligent misrepresentation claim does not depend on whether Fleming is able to establish its breach of contract claim. The Court of Appeals rejected an argument similar to Fleming's in *Sovereign Bank*, where the Court applied the economic loss doctrine to a card issuer's negligence claim against other financial institutions with which it had no contractual relationship. The Court of Appeals explained:

> *Bilt–Rite* did not hold that the economic loss doctrine may not apply where the plaintiff has no available contract remedy . . .. [T]he *Bilt–Rite* Court simply carved-out an exception to allow a commercial plaintiff to seek recourse from an "expert supplier of information" with whom the plaintiff has no contractual relationship, in very narrow circumstances not relevant here. The

> Pennsylvania Supreme Court emphasized that its holding was limited to those "businesses" which provide services and/or information that they know will be relied upon by third parties in their business endeavors."

533 F.3d 180 (citing *Bilt-Rite*, 866 A.2d at 286). More recently, the Third Circuit faced an identical argument in *Azur*, where the plaintiff sought to avoid the application of the economic loss doctrine because he did not have a contractual remedy. 601 F.3d at 223. Relying on its holding in *Sovereign Bank*, the *Azur* Court rejected plaintiff's argument "that the *Bilt-Rite* exception encompasses all cases in which the plaintiff has no contractual remedy." *Id.* at 223-24. *See also Slippery Rock Area Sch. Dist. v. Tremco, Inc.*, Civ. A. No. 15-1020, 2016 WL 3198122, at *13 (W.D. Pa. June 9, 2016) (citing *Bilt-Rite*, 866 A.2d 270) ("Plaintiff's negligence claims are barred by the economic loss doctrine, which may apply whether or not a contract exists between the parties."). Thus, based on *Sovereign Bank* and *Azur*, the Court finds that it may grant summary judgment on Fleming's negligent misrepresentation claim, if warranted, regardless of the disposition of its breach of contract claim.

Fleming also argues that the exception to the economic loss doctrine adopted by the Pennsylvania Supreme Court in *Bilt-Rite* applies to the facts of this case. Fleming maintains that Jacobs, an architectural and engineering company, is exactly the type of party to which Section 552 applies, and its claim for negligent misrepresentation falls squarely within Section 552(1). In support, Fleming submits that Jacobs owed a duty to provide information to Fleming as to what transpired during multiple design meetings that Jacobs attended with the Navy, as Fleming was effectively providing services as an engineering subcontractor under the Navy Delivery Order. Fleming contends that this is evidenced by Jacobs' designation of Fleming as the sole-source in the bid documents disseminated to potential bidders. Fleming further alleges that Jacobs intended Fleming and others to rely upon its representations and bid documents and was

meant to ensure that Fleming would supply the design-work necessary for Jacobs to draft the project specifications. In addition, Fleming maintains that Jacobs' representations that the Navy had agreed to sole source the hangar doors to Fleming were false, which Jacobs knew, or should have known. *See* Note 5, *supra*. Therefore, Jacobs submits, the economic loss rule does not bar recovery here.

Moreover, Fleming argues that the holding in *Bilt-Rite* can be applied to the facts of this case without requiring a change in the law, solely on the premise that Jacobs supplied information in a transaction in which it had a pecuniary interest. According to Fleming, the existence of a pecuniary interest supplies the foreseeability and the duty that is lacking in cases involving tort claims for purely economic loss, and thus obviates the need for the economic loss rule.

In reply, Jacobs correctly points out that the Court in *Bilt-Rite* "carved out a narrow exception [to the economic loss doctrine] when losses result from the reliance on advice of professionals", as stated in *Sovereign Bank*, 533 F.3d at 178. Moreover, Jacobs argues that since *Bilt-Rite*, the Pennsylvania Courts have uniformly rejected the application of the *Bilt-Rite* exception to those who are not "in the business of providing information for pecuniary gain," citing *Excavation Technologies,* 985 A.2d at 844 (even though a utility company "enjoys an economic benefit from providing accurate information", it does not fall within the *Bilt-Rite* exception because it is not a "professional information provider."). In addition, Jacobs relies on *Whitaker v. Herr Foods, Inc.,* 198 F. Supp. 3d 476, 491 (E.D. Pa. 2016), for the proposition that it is not sufficient that a representation is made in the course of the defendant's business for the *Bilt-Rite* exception to apply; rather, the representation itself must be a "professional representation." Here, Jacobs submits that its representation to Fleming concerned the status of

Fleming's sole-source with the Navy, a question which, in turn, depends on an understanding of the FAR and NAVFAC's sole-source approval procedures. *See* Aguon Dep. at 54, Pl.'s Ex. BB (ECF No. 87-28).[15] Jacobs contends, however, that it is not in the business of providing legal advice, advice about the FAR, or federal procurement advice for compensation, *see* Hoff Decl. ¶4 (Def.'s App. Ex. 14), and, as such, its representation to Fleming about the status of the sole source is not its "professional representation," *Whitaker*, 198 F. Supp. 3d at 491. Therefore, Jacobs submits that the *Bilt-Rite* exception to the economic loss doctrine does not apply here.

The Court agrees with Jacobs that the *Bilt-Rite* exception does not apply here. Jacobs was hired by the Navy for Project 3010 to provide A/E services in connection with the design of a hangar at the Andersen Air Force Base in Guam. Thus, Jacobs' status as a design professional appears, superficially, to trigger application of *Bilt-Rite*. However, the alleged misrepresentation upon which Fleming relied was not made in the design and specifications documents submitted by Jacobs to the Navy. Rather, the alleged misrepresentation, made by Jacobs directly to Fleming, was that the Navy agreed to sole-source the hangar door project to Fleming. The sole-source representation did not convey architectural or engineering design information or specifications regarding the project, but was ancillary to Jacobs' professional services which it was hired to provide by the Navy. *See Whitaker*, 198 F. Supp. 3d at 491 ("representations on a product's label made by a manufacturer materially differ from the professional representations made by an accountant, lawyer, or architect for pecuniary gain"; "[a]ny information conveyed . . . by the products' labels 'was ancillary to' the products' sale.") (citations omitted). As such, the sole source representation was not a "professional representation", i.e., was not rendered in Jacobs' professional capacity as the A/E to the Navy. Therefore, Fleming's negligent

[15]     Aguon testified that NAVFAC was not obligated to sole source the hangar door project to Fleming because the J&A had not been "finalized, reviewed, nor approved." Aguon Dep. at 54. Pl.'s App. Ex. BB is filed under seal.

misrepresentation claim, which is predicated on the sole source representation, and not on a representation about Jacobs' work product, does not fall within the *Bilt-Rite* exception.

This conclusion is further buttressed by the rationale underlying the *Bilt-Rite* Court's decision to apply Section 552 to architects and design professionals. In this respect, the Pennsylvania Supreme Court noted that liability under Section 552 flows from the foreseeability of economic losses resulting from the negligent breach of an architect's common law duty of due care in the performance of its contract with the party hiring the architect. *See Bilt-Rite*, 866 A.2d at 286 (quoting *Davidson*, 255 S.E. 2d at 584). Here, Fleming has not argued, nor does the evidence show, that Jacobs breached a duty of due care in the performance of its contract *with the Navy* to provide A/E services in connection with the design of a hangar at the Andersen Air Force Base in Guam. Thus, the basis for finding Section 552 applicable here—the architect's breach of the duty of due care in the performance of its contract with the project's owner— simply does not exist. Where, as here, there is no evidence that the design professional negligently breached its duty of due care to the Navy, there can be no foreseeable economic loss resulting to a potential subcontractor—Fleming—cognizable under Section 552.

Likewise, the Court rejects Fleming's argument that *Bilt-Rite* should be applied because Jacobs supplied information in a transaction in which it had a pecuniary interest. The Pennsylvania Supreme Court in *Excavation Technologies* made clear that the information supplied must be a "professional representation," made by a design professional, akin to an architect. *Excavation Techs.*, 985 A.2d at 843. The mere fact that a supplier of information stands to gain financially from a transaction in which it has a pecuniary interest is not enough to bring the negligent misrepresentation claim within the *Bilt-Rite* exception. *See id.* at 842-43 (rejecting plaintiff's argument that the utility company should be liable for economic losses

---

*See* ECF No. 91.

under § 552(1) and (2) because like the architectural firm in *Bilt-Rite*, the utility company enjoyed an economic benefit from providing accurate information about the location of its underground lines.").   To hold otherwise would expand the application of *Bilt-Rite* beyond the narrow scope intended by the Pennsylvania Supreme Court.

Finally, Fleming argues that under Pennsylvania common law, a plaintiff may recover for purely economic losses occasioned by tortious conduct if the parties had a special relationship to one another, relying on *Aikens v. Baltimore & Ohio R.R. Co.,* 501 A.2d 277, 278 (Pa. Super. Ct. 1985) ("[R]ecovery for purely economic loss occasioned by tortious interference with contract or economic advantage is not available under a negligence theory.   A cause of action exists in this situation only if the tortious interference was intentional or involved parties in a special relationship to one another.") (citation omitted).   Fleming submits it had a special relationship with Jacobs so as to give rise to a claim for economic loss.   In support, Fleming argues that because it had no privity of contract with the Navy and had no direct dealings with the Navy, it relied exclusively on Jacobs to convey information regarding its sole source status, and Jacobs was aware of, and acquiesced to, Fleming's reliance.   Thus, Fleming maintains that Jacobs cannot now claim that the loss sustained by Fleming was unforeseeable and not directly a result of the negligent misrepresentation.

In reply, Jacobs argues that the Pennsylvania Supreme Court has not recognized a "special relationship" exception to the economic loss doctrine, and Fleming fails to cite any authority for allowing a plaintiff to recover solely economic damages in a negligence action under a "special relationship exception."   Even if such an exception did exist, Jacobs maintains that there is no such special relationship between itself and Fleming.   Jacobs submits that Fleming has not shown any "overmastering influence" by Jacobs over Fleming, but rather, the

parties operated at arms' length. Moreover, based on *Rearick v. Elderton State Bank,* Nos. 1769 WDA 2014, 1770 WDA 2014, 2015 WL 7301893, at *12 (Pa. Super. Ct. Nov. 19, 2015), Jacobs contends that mere reliance on information provided by another party does not create a special relationship exception to the economic loss doctrine.[16]

The case law suggests that tort actions for economic losses arising from a breach of contract that might otherwise be precluded by the economic loss doctrine may proceed where the plaintiff is able to establish a special relationship between the parties. *See, e.g.*, *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998) (citing *Stout v. Peugeot Motors of Am.*, 662 F. Supp. 1016, 1018 (E.D. Pa. 1986)); *id.* at 952-53 (claim for negligent interference with contractual relations did not lie where plaintiff failed to establish a special relationship between parties to an arm's length business contract); *Enslin v. Coca-Cola Co.*, 136 F. Supp. 3d 654, 672 (E.D. Pa. 2015) (citing *Valley Forge*, 28 F. Supp. 2d at 952) ("Pennsylvania courts have found an exception to the Economic Loss Doctrine where the plaintiff and defendant are in a 'special relationship.'"); *id.* at 673-74 (finding plaintiff failed to establish a special relationship and therefore negligence action and negligent misrepresentation claim for economic losses arising from breach of contract were barred by economic loss doctrine; *Aikens*, 501 A.2d at 278 ("[R]ecovery for purely economic loss occasioned by tortious interference with contract or economic advantage is not available under a negligence theory. A cause of action exists in this situation only if the tortious interference was intentional or involved parties in a special relationship to one another.").

---

[16]     Jacobs also relies on *Elliott-Lewis Corp. v. Skanska USA Bldg., Inc.*, Civ. A. No. 14-03865, 2016 WL 2346737, at *6 (E.D. Pa. May 4, 2016), for the same proposition. However, such reliance is misplaced as that case did not involve a question of whether a "special relationship" existed between the parties to avoid application of the economic loss doctrine.

A "special relationship" is one involving confidentiality or a fiduciary duty. *See Commw. of Pa., Dep't of Transp. v. E-Zparks, Inc.*, 620 A.2d 712, 717 (Pa. Commw. Ct. 1993). As the Commonwealth Court explained:

> A confidential relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." *Estate of Clark*, 467 Pa. 628, 635, 359 A.2d 777, 781 (1976). (citation omitted). A business association may be the basis of a confidential relationship "only if one party surrenders substantial control over some portion of his affairs to the other." *In Re: Estate of Scott*, 455 Pa. 429, 433, 316 A.2d 883, 886 (1974).

*Id.* at 717. In determining whether a special relationship exists between the parties, the "critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 23 (Pa.Super.Ct. 2002) (quoting *Basile v. H & R Block*, 777 A.2d 95, 101 (Pa.Super .Ct. 2001)). The Superior Court further held that a "confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." *Id.* (citing *Basile, id.* at 102) (footnote omitted).

The courts have also held that a special relationship does not "exist between parties to an arms-length business contract." *Enslin*, 136 F. Supp. 3d at 672 (citing *Valley Forge*, 28 F. Supp. 2d at 952-53). As the District Court explained in *Valley Forge*, "[i]f parties to routine arms' length commercial contracts for the provision of needed goods or services were held to have a 'special relationship,' virtually every breach of such a contract would support a tort claim." 28

F. Supp. 2d at 953 (citing *Elliott v. Clawson*, 204 S.2d 272, 273 (Pa. 1964) (no special relationship between parties to arms length business contract)) (other citations omitted).

Here, Fleming contends that a "special relationship" arose when it relied exclusively on Jacobs to convey information regarding its sole source status, and Jacobs was aware of, and acquiesced to, Fleming's reliance. However, Fleming's mere reliance on the superior skill of Jacobs is not enough to establish a "special relationship." *eToll*, 811 A.2d at 23. Fleming does not contend that Jacobs exercised overmastering influence over it, or that it was in a position of "weakness, dependence, or justifiable trust." Rather, the record shows that Fleming is an established commercial business that has engaged in numerous commercial transactions for the design and manufacture of various types of doors and/or component parts for numerous government projects. The relationship between Fleming and Jacobs more closely resembles an arms' length business arrangement between commercial entities, which the courts have found do not give rise to a "special relationship." *Valley Forge*, 28 F. Supp. 2d at 953 ("If parties to routine arms length commercial contracts for the provision of needed . . . services were held to have a 'special relationship,' virtually every breach of such a contract would support a tort claim.") (citations omitted). Thus, the Court concludes that a rational jury could not find, based on the record, that a "special relationship" existed between Fleming and Jacobs. As such, Fleming's negligent misrepresentation claim which seeks only economic losses cannot defeat application of the economic loss doctrine.

In summary, for the reasons set forth above, the Court finds that the economic loss doctrine bars Fleming's negligent misrepresentation claim against Jacobs. As such, the Court need not reach Jacobs' additional arguments in support of its motion for summary judgment on

Fleming's negligent misrepresentation claim. Accordingly, the Court finds that Jacobs is entitled to summary judgment in its favor on Fleming's negligent misrepresentation claim.

### C. Unjust Enrichment (Count VI)

Essentially an equitable doctrine, an unjust enrichment claim arises from a quasi-contract. *Gutteridge v. J3 Energy Group, Inc.,* 165 A.3d 908, 916-17 (Pa. Super. Ct. 2017) (citing *Styer v. Hugo*, 619 A.2d 347 (Pa. Super. Ct. 1993); *Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 833 (Pa. Super. Ct. 2008)). "'A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another.'" *Stoeckinger*, 948 A.2d at 833 (quoting *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001)).

In Pennsylvania, the "elements of an unjust enrichment claim are 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" *AmeriPro Search*, 787 A.2d at 991 (quoting *Styer,* 619 A.2d at 350). As the Superior Court further noted in *Styer*, the application of the doctrine will depend on the unique factual circumstances of each case. 619 A.2d at 350. Thus, in making this determination, the Court must focus not on the intention of the parties, but rather, on whether the defendant has been unjustly enriched. *Id.*

"In order to determine whether the defendant in a *quantum meruit* action has been unjustly enriched such that the plaintiff is entitled to damages, [the court must] consider whether the plaintiff has conferred a benefit on the defendant which has been realized and retained." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 179 A.3d 1093, 1103 (Pa. 2018) (citing *Shafer Elec. & Const. v. Mantia*, 96 A.3d 989, 993 (Pa. 2014)). An unjust enrichment claim will not lie simply because the defendant may have

benefited as a result of the plaintiff's actions. *Gutteridge*, 165 A.3d at 917 (citing *Styer*, 619 A.2d at 350). If unjust enrichment has been established, "the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred." *AmeriPro Search*, 787 A.2d at 991 (citing *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328-29 (Pa. Super. Ct. 1995)).

Thus, if the factfinder determines that Jacobs has been unjustly enriched,[17] "the measure of damages is the value of the benefits conferred; that is, [Jacobs] must make restitution to [Fleming] in *quantum meruit*." *Gutteridge*, 165 A.2d at 918 (citing *AmeriPro Search*, 787 A.2d at 991). *See also Pulli v. Warren Nat'l Bank*, 412 A.2d 464, 465 (Pa. 1979) (damages for unjust enrichment are measured by the reasonable value of the services rendered); *Martin v. Little, Brown & Co.*, 450 A2d 984, 988 n. 2 (Pa. Super. Ct. 1981) (same).

Based on this measure of damages, Jacobs asks the Court to enter summary judgment in its favor on Fleming's unjust enrichment claim on the basis that (1) Fleming has failed to adduce evidence quantifying the "reasonable value" of its services; and (2) establishing the "reasonable value" of its services requires expert testimony, which Fleming does not have. For the reasons set forth below, the Court does not find any merit to Jacobs' arguments.

Jacobs first argues that Fleming has failed to quantify the reasonable value of the services it provided to Jacobs. In support, Jacobs contends that during discovery, Fleming did not produce any evidence about the "reasonable value" of its services, and points to Fleming's response to Defendant's Interrogatory No. 4, asking Fleming to set forth with specificity the amounts and categories of damages it is seeking. Def.'s App. Ex. 26 (ECF No. 75-27). In response to interrogatory no. 4, Fleming stated that "in the event that [it] does not prevail on

---

[17]     Jacobs does not challenge whether the evidence supports the elements of an unjust enrichment claim, but rather challenges only whether the evidence is sufficient with regard to establishing restitution damages.

Counts I [breach of contract] or II [negligent misrepresentation], [it] seeks recovery in quantum meruit for the value of its services for the amounts set forth above." *Id.* The amounts set forth above consisted of unabsorbed overhead (8, 693 shop hours and 3,675 engineering hours times $32.35 per hour or $400,104.80), and lost profit of 17.25% ($881,012.56), on each project; and expenses incurred on Project 3010 ($159,106.20).[18] Jacobs submits that Fleming's response to Interrogatory No. 4 is insufficient to create a genuine issue of material fact for summary judgment.

In response, Fleming argues that at a bare minimum, the value Jacobs received equaled the hourly charges for Fleming's engineers and design professionals who designed the hangar doors. Fleming points out that during the course of discovery, Jacobs spent a considerable amount of time examining Fleming's time records showing which employees performed services on the project and when. *See* Kohn Dep. at 75, 136-39, 142-44, 156-58, 161, 172-73; Ex. 43 to Kohn Dep, Pl.'s App. Ex. KK (ECF No. 87-37). Fleming also cites to Mr. Kohn's deposition, where he testified as to the hourly rates of each employee and the involvement by each. Kohn Dep. at 138-40. In addition, Fleming states that at trial, it will offer Mr. Kohn's testimony as to what costs Fleming expended on the project, relying extensively on the records maintained by Fleming and which were produced and discussed during discovery. Lastly, Fleming proffers the Rebuttal Report of its expert witness, David E. Pearson, in which he opined, inter alia, that the information available is sufficient to establish and quantify Fleming's claim for lost overhead, lost profit, and expenses incurred, and that the profit (profit and contingency) asserted by

---

[18] The expenses incurred represent the time spent by Fleming's design professionals in providing design services to Jacobs.

Fleming was reasonable and within industry standards.[19]    Pearson Rebuttal Report, Pl.'s App. Ex. LL (ECF No. 87-38).

Contrary to Jacobs' argument, the record does contain evidence of the value of design services Fleming provided to Jacobs.   Mr. Kohn testified that Fleming maintained time records of expenses incurred in designing the hangar doors.   *See* Kohn Dep. at 136; Pl.'s App. Ex. KK. The time records show that the design work was performed in 2011 through 2014.   Pl.'s App. Ex. KK.   Mr. Kohn further testified that Fleming incurred over $159,000 in actual costs in designing the hangar doors, exclusive of lost profit and overhead.   Kohn Dep. at 161.   Certainly, Fleming's time records, kept in the ordinary course of business, showing the actual time spent on designing the hangar doors, are a starting point for determining the reasonable value of the services provided to Jacobs.   *See, e.g., Commw. of Pa., Governor's Energy Council v. Am. Energy Servs., Inc.*, 494 A.2d 72, 75 (Pa. Commw. Ct. 1985)(discussed *infra* at pages 68-69).

Fleming attempts to establish that the value of its design services is reasonable based on the testimony of Mr. Hoff regarding Fleming's ROM totaling $3,984,000 for the hangar doors. In particular, Fleming points to Mr. Hoff's testimony that he felt Fleming's ROM was "fair and reasonable", and that the total price of $3,984,000 for the hangar doors "seems fine for a door that's never been built before".   Hoff Dep. at 90-93.   However, Fleming's ROM budget quotation provides its anticipated *construction* costs of the hangar doors.   Pl.'s App. Ex. Z. Fleming's ROM does not contain any costs for the design services provided to Jacobs, nor would it because the ROM estimate is being submitted to the Navy with the expectation of obtaining a sole source for the *construction* of the hangar doors.   Thus, the cited testimony of Mr. Hoff regarding Fleming's ROM is insufficient to establish that the value of Fleming's design services

---

[19]    In a footnote, Mr. Pearson noted that cost would be an appropriate measure of damages for unjust enrichment.  Pearson Rebuttal Report at 16, n. 5, Pl.'s App. Ex. LL.

was reasonable. However, this is not fatal to Fleming's unjust enrichment claim.

The report of Fleming's rebuttal expert appears to provide some basis for determining the reasonable value of Fleming's design services to Jacobs. For example, Mr. Pearson states that he has "reviewed Fleming's time records related to the Projects at issue and finds that they are typical of the records maintained by companies with which I have worked and am of the opinion that they are more than sufficient to support and quantify Fleming's costs of design services." Pearson Report at 15. Although Mr. Pearson does not specifically opine in his report as to whether these costs constitute the "reasonable value" of Fleming's services, given his extensive background in the construction industry and experience with government construction projects, he may very well be able to provide an opinion as to the reasonable value of Fleming's technical design and engineering services in the market of government contracting.

Jacobs takes issue with Fleming's reliance on the hourly rates it paid its design professionals and engineers, arguing that those rates represent Fleming's loss, not Jacobs' gain. While it is true that a plaintiff cannot recover *lost profits* as damages for an unjust enrichment claim, the hourly rates Fleming paid its design professionals and engineers represents Fleming's cost of the benefit it conferred on Jacobs. According to the RESTATEMENT (THIRD) OF RESTITUTION, "when a professional recovers in restitution for the value of services rendered pursuant to an unenforceable contract, there will not necessarily be a meaningful distinction between the value of the services to the recipient, their cost to the claimant, their market value, and a price fixed by the unenforceable agreement." RESTATEMENT (THIRD) OF RESTITUTION, § 49 (March 2019). Hence, the only question is whether the time spent by Fleming's design professionals and their hourly rates represent the fair market value for such services in the market of government contracting.

The use of time sheets and expense vouchers was deemed adequate proof of the reasonable value of services rendered as damages for restitution in *Commonwealth of Pennsylvania, Governor's Energy Council v. American Energy Services, Inc.*, 494 A.2d 72, 75 (Pa. Commw. Ct. 1985). In that case, American Energy Services ("AES") was the winning bidder on a government project for the development and implementation of a residential energy analysis computer program, whose contract required approval by the U.S. Department of Energy ("DOE"). *Id.* at 73-74. While the contract was being reviewed by DOE, AES commenced work on the project, based on assurances from the state agency's chief contracting officer that the approval of the contract by DOE was a "mere formality." *Id.* at 74. However, DOE never approved the contract. *Id.* AES filed a claim against the state agency to recover its unpaid invoices for the work performed, and the board of claims determined that the state agency should be equitably estopped from defending the claim on the ground that the state had not fully executed the contract. On appeal, the Pennsylvania Commonwealth Court upheld the board's award of damages for restitution that was based on the reasonable value of services rendered, regardless of their value to the recipient, because it found the recipient was more at fault than the provider. *Id.* at 75 (citing RESTATEMENT OF RESTITUTION § 40, comment f (1937)). As proof of the reasonable value of the services rendered, AES submitted time sheets and expense vouchers, which the court held was ample evidence from which the board of claims could determine the reasonable value of the AES's services. *Id.* at 75-76.

Similarly, in *ATACS Corp.*, the court of appeals held that the appropriate measure of damages was "'the fair value of [the subcontractor's] contribution to [the prime contractor's] agreement,' in order to protect the subcontractor's restitution interest." 155 F.3d at 671 (quoting *Air Tech.*, 199 N.E. 2d at 549). The Court of Appeals noted that the district court properly

59

concluded that the plaintiffs contributed valuable services to defendant's RFP bid and significantly enhanced its chances of winning the project. *Id.* However, the district court denied restitution damages because "it [was]not clear how to quantify the value of those services" and awarded nominal damages in the amount of $1.[20] *Id.* The Court of Appeals found that the District Court's denial of restitution as a possible remedy was premature without holding an evidentiary hearing, and took issue with the district court's failure to offer the parties an opportunity to present additional evidence that might shed light on the quantification of restitution damages. *Id.* The Court of Appeals noted that "[s]uch evidence might include the testimony of knowledgeable experts in the field who would testify as to the reasonable value of plaintiffs' technical and consulting services in this market of government contracting." *Id.* Given the possibility that the plaintiffs might be able to prove reasonable restitution damages, the court of appeals vacated the District Court's award of nominal damages and remanded the case.[21]

"[T]he general rule in Pennsylvania, as in most jurisdictions, is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty." *ATACS Corp.*, 155 F.3d at 669 (citing *Scobell, Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. Ct. 1997)). Mathematical certainty is not required and any doubts are construed against the party unjustly enriched. *Id.* (citations omitted). "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *Id.* at 669-70 (quoting *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988)).

Based on *Government Energy Council* and *ATACS Corp.*, the Court finds that the record contains sufficient evidence to quantify the value of Fleming's damages in *quantum meruit*.

---

[20]    The District Court was presented with conflicting evidence of the value of the plaintiffs' services, and thus concluded that it had no reasonable basis to calculate the value of plaintiffs' service and assistance provided to the defendant. 155 F.3d at 665.

Jacobs's second argument is likewise unpersuasive. Jacobs submits that calculating the reasonable value of Fleming's services to Jacobs involves a determination of the fair market value of its work on the blast-rated hangar door designs and specifications for a U.S. military aircraft hangar, which requires specialized knowledge that can only be provided by an expert witness. In support, Jacobs cites several cases for the general proposition that expert evidence is required "when an issue is beyond the ken of a lay jury." Def.'s Br. at 30 (citing *McMunn v. Babcock & Wilcox Power Generation Group, Inc.*, 869 F.3d 246, 267 (3d Cir. 2017); *Young v. Commw. of Pa. Dep't of Transp.,* 744 A.2d 1276, 1279 (Pa. 2000)). Because Fleming has failed to designate an expert on the value of its services, Jacobs contends that Fleming is barred from recovering for such damages, and therefore, summary judgment should be granted on Fleming's unjust enrichment claim.

In response, Fleming argues that expert testimony is not required to present evidence with respect to which of its employees worked on the project, the days they worked, the work performed, and the hourly rate assigned to each. Fleming contends that Mr. Kohn, a lay witness with first hand knowledge of Fleming's business operations, is competent to testify as to these damages without the use of an expert. In support, Fleming cites a number of cases holding that expert opinions are not required to establish lost profits, and may be established through lay testimony alone where the witness possesses a particularized personal knowledge of the business' operations.

As this Court has held in prior cases, Fleming will likely be able to establish the value of the design services rendered to Jacobs based on its time sheets and the testimony of Mr. Kohn regarding his particularized knowledge due to his position at the business. *See e.g., Autoforge,*

---

[21]    The appeal in *ATACS Corp.* was taken from the final judgment of the District Court entered after a bench trial.

61

*Inc. v. American Axle & Manufacturing, Inc.*, Civ. A. No. 02-1265, 2008 WL 65603, at *8 (W.D. Pa. Jan. 4, 2008) (holding that president of business was authorized to offer lay opinion testimony concerning damages sustained "based on facts within his particularized knowledge by virtue of his position at Autoforge and to the extent a proper foundation is laid."). It is unclear whether Mr. Kohn can testify as to whether the value of its services rendered to Jacobs is reasonable in the government contract market. Nonetheless, Fleming has retained an expert who may be able to testify as to the reasonableness of the value of the design services. Based on *ATACS Corp.*, it is premature for the Court to conclude at the summary judgment stage that Fleming cannot establish the reasonable value of its design services to Jacobs, either through Mr. Kohn and/or Mr. Pearson. Accordingly, the Court will deny Jacobs' motion for summary judgment on Fleming's unjust enrichment claim.

## V. CONCLUSION

For the reasons set forth above, the Court will **grant** Jacob's Motion for Summary Judgment (ECF No. 75) as to Count I – breach of contract **as to Project 3027 only**, and Count II – negligent misrepresentation. The Court will **deny** the motion as to Count I – breach of contract claim **as to Project 3010 only**, and Count VI – unjust enrichment. An appropriate order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated:  March 15, 2019

cc/ecf:  All Counsel of Record